# EXHIBIT 1

# CITIGROUP 401(k) PLAN

MAY 2001

## CONTENTS

For U.S. and expatriate staff employees

Investments funds .............................2

What you need to know ..................3

How to complete a rollover...............4

Company contributions.....................5

Changes in plan rules.........................6

How to contact the Citigroup ...........6
  401(k) Plan

Repaying a loan by direct debit ......7

How to report a change .....................8
  of address

EFFECTIVE JULY 1, THE TRAVELERS GROUP 401(k) SAVINGS PLAN AND THE CITIBUILDER 401(k) PLAN WILL BE COMBINED INTO ONE PLAN: THE CITIGROUP 401(k) PLAN.

The plan will be managed by CitiStreet LLC, which is a joint venture between Citigroup and the State Street Corporation. CitiStreet will operate a customer service center and Web site.

The Citigroup 401(k) Plan will have approximately 130,000 participants, representing both active and former employees, with combined assets of $10 billion. The Citigroup 401(k) Plan will be one of CitiStreet's largest customers in terms of the number of participants and dollars invested.

The merger of the plans will affect administration, recordkeeping, and the names of the funds. However, eligibility for and features of the company contributions remain the same.

HIGHLIGHTS OF THE CITIGROUP 401(k) PLAN:

- One recordkeeper: If you currently have a balance in both the Travelers Group 401(k) Savings Plan and the Citibuilder 401(k) Plan because you transferred from one Citigroup business to another, those balances will be combined.

- One new Web site: You'll have a new 401(k) plan Web site through which you can complete plan transactions, obtain plan information, and model your portfolio, a new feature that's not available on the current 401(k) plan Web sites.

- More hours to speak with a customer service representative: Representatives will be available from 8 a.m. to 8 p.m. Eastern time on weekdays.

IF YOU HAVE A BALANCE IN THE GENEVA COMPANIES 401(k) SAVINGS PLAN, THE SAVINGS AND INVESTMENT PLAN FOR ASSOCIATES OF WELLSPRING RESOURCES, OR THE STATE STREET SALARY SAVINGS PLAN:
The information in this newsletter applies to you since you're currently eligible to participant in either the Travelers Group 401(k) Savings Plan or the Citibuilder 401(k) Plan. You'll receive additional information later this month about how the funds in your prior plan will be "mapped" to the funds in the Citigroup 401(k) Plan.

IF YOU'RE AN EMPLOYEE OF THE ASSOCIATES OR A FORMER EMPLOYEE OF ARCADIA:
The information in this newsletter *doesn't* apply to you. Instead, you'll receive other information about how the funds in your current 401(k) plan will be "mapped" to the funds in the Citigroup 401(k) Plan.




# INVESTMENT FUNDS

The Citigroup 401(k) Plan will offer the 21 open funds offered in both the Travelers Group and Citibuilder plans plus eight closed funds. The names of some of the funds will be changed.

| Current name of fund in the Citibuilder 401(k) Plan | Current name of fund in the Travelers Group 401(k) Savings Plan | Name of fund in the Citigroup 401(k) Plan |
|---|---|---|
| Fund B-Citigroup Common Stock Fund | Citigroup Common Stock Fund | Citigroup Common Stock Fund |
| Fund E-Capital Preservation Fund | Stable Value Fund | Stable Value Fund |
| Smith Barney Money Funds, Cash Portfolio Fund | Money Funds Cash Portfolio | Smith Barney Money Funds, Cash Portfolio Fund |
| Fund A-Fixed-Income Securities Fund | Fixed-Income Securities Fund | Fixed-Income Securities Fund |
| Fund D-Smith Barney Government Securities Fund | Government Fund | Government Securities Fund |
| Fund P-Smith Barney Diversified Strategic Income Fund | Strategic Income Fund | Smith Barney Diversified Strategic Income Fund |
| Fund Q-Salomon Brothers High Yield Bond Fund | High Yield Bond Fund | Salomon Brothers High Yield Bond Fund |
| Fund H-Conservative Focus Fund | Conservative Focus Fund | Conservative Focus Fund |
| Fund II-Moderate Focus Fund | Moderate Focus Fund | Moderate Focus Fund |
| Fund H-Aggressive Focus Fund | Aggressive Focus Fund | Aggressive Focus Fund |
| Fund G-Diversified Equity Investments Fund | S&P 500 Index Fund | S & P 500 Index Fund |
| Fund J-Smith Barney Appreciation Fund | Appreciation Fund | Smith Barney Appreciation Fund |
| Fund J-Smith Barney Large Cap Growth Fund | Large Cap Growth Fund | Smith Barney Large Cap Growth Fund |
| Fund R-Smith Barney Large Cap Value Fund | Large Cap Value Fund | Smith Barney Large Cap Value Fund |
| Fund S-Salomon Brothers Investors Fund | Investors Fund | Salomon Brothers Investors Fund |
| Fund F-Small Cap Fund | Russell 2000 Index Fund | State Street Global Advisors Russell 2000 Index Strategy Fund |
| Fund K-Smith Barney Aggressive Growth Fund | Aggressive Growth Fund | Smith Barney Aggressive Growth Fund |
| Fund L-Smith Barney International All Cap Growth Fund | International All Cap Growth Fund | Smith Barney International All Cap Growth Fund |
| Fund O-International Securities Fund | International Securities Fund | International Securities Fund |
| Fund M-EuroPacific Growth Fund | EuroPacific Growth Fund | EuroPacific Growth Fund |
| Fund T-Templeton Developing Markets Fund | Templeton Developing Markets Fund | Templeton Developing Markets Fund |

The closed funds, which do not accept either new money or new participants, will keep their current names.

| VKAC Enterprise Growth Fund | Closed to new participants |
|---|---|
| VKAC Enterprise Fund | Closed to new participants |
| VKAC Comstock Fund | Closed to new participants |
| VKAC Government Securities Fund | Closed to new participants |
| American Express Common Stock Fund | Closed to new contributions |
| Salomon Capital Fund | Closed to new contributions |
| Salomon Money Market Fund | Closed to new contributions |
| State Street Common Stock Fund | Closed to new contributions |

# WHAT YOU NEED TO KNOW

The current recordkeepers and CitiStreet will transfer account balances and reconcile participant accounts from June 30 through July 19.

During this time you will *not* be able to obtain personal account information or complete any plan transactions. Some transactions, such as requesting a loan or a withdrawal, will have longer "blackout" periods as shown in the table below. However, both contributions and loan payments will continue to be deducted from pay and will be invested based on your investment elections on file as of the deadline dates below (June 29 for the Travelers Group plan or June 28 for the Citibuilder plan).

If you're planning to complete any of the transactions below within the next few weeks, be sure to note the deadlines. If you don't complete your transaction through your current plan by the deadlines below, you must wait until July 20.

| If you want to: | And you're a participant in the: | |
|---|---|---|
| | Travelers Group 401(k) Savings Plan | Citibuilder 401(k) Plan |
| | You must complete your transaction online or by telephone using the current process by: | |
| Enroll or re-enroll in the plan | 3 p.m. ET June 29 | 4 p.m. ET June 28 |
| Change your contribution rate | 3 p.m. ET June 29 | 4 p.m. ET June 28 |
| Change your investment elections | 3 p.m. ET June 29 | 4 p.m. ET June 28 |
| Transfer or reallocate your plan balance | 3 p.m. ET June 28 | 4 p.m. ET June 26 |
| Request a general-purpose loan | 3 p.m. ET June 27 | 4 p.m. ET June 26 |
| Request an in-service withdrawal | 3 p.m. ET June 27 | 4 p.m. ET June 26 |
| Request a distribution because you terminated employment or retired | 3 p.m. ET June 27 | 4 p.m. ET June 26 |
| Request a coupon to pay off your loan | 3 p.m. ET May 31 | 4 p.m. ET May 18 |

3

| If you want to: | And you're a participant in the: | |
|---|---|---|
| | Travelers Group 401(k) Savings Plan | Citibuilder 401(k) Plan |
| | Your completed paperwork must arrive at the 401(k) plan service center by 5 p.m. Eastern time on: | |
| Apply for a distribution | | |
| Submit a rollover contribution check with appropriate documentation | June 20 | June 19 |
| Request a hardship withdrawal | | June |
| Pay off a loan by check | June 15 | June 19 |
| Make a coupon loan payment | June | June 19 |
| Submit a qualified domestic relations order (QDRO) | May 31 | May 30 |

# HOW TO COMPLETE A ROLLOVER DURING THE TRANSITION PERIOD

If you're planning to request a rollover distribution from a previous employer's qualified plan, or you have a rollover distribution to deposit, keep in mind that if the check is made payable to you (an indirect rollover*), you have 60 days from the day you receive the rollover check to deposit it into a 401(k) plan.

The check — whether an indirect rollover made payable to you or a direct rollover made payable to the plan — must arrive at your 401(k) plan service center with the completed rollover documents no later than the deadline on the table above.

If your check arrives after the deadline or without the completed paperwork it will be returned to you, and you'll need to take the following steps:

_____
* If the check is made payable to you, the issuing plan is required to withhold 20% in federal income tax. As a result, only 80% of your plan balance is available to be rolled over. To roll over an amount equal to 100% of your payment, you would need to use your own money to replace the 20% withheld.

If the check is made payable to the plan: You'll have to ask your previous employer's qualified plan to reissue the check to the Citigroup 401(k) Plan.

If the check is made payable to you and the 60 days won't expire until after July 20: You can deposit it into the Citigroup 401(k) Plan.

If the check is made payable to you and your 60 days to deposit your rollover will expire between the deadline above and July 20: The previous plan may consider the check a taxable distribution to you. If so, you'll have to pay taxes on the amount of the distribution, and you may be subject to a 10% premature withdrawal excise tax. You can avoid paying taxes and a possible penalty by depositing your rollover contribution to:

• A "conduit" or "rollover" IRA. A conduit or rollover IRA is an IRA opened *only* to hold rollovers from a previous employer's qualified plan. You may roll over the assets from this conduit or rollover IRA to another employer's qualified plan at a later date. When you withdraw the assets from the IRA you must complete the rollover to the qualified plan within 60 days to avoid ordinary income tax and, in some situations, a 10% premature withdrawal excise tax.

OR

• A regular IRA. Once the rollover amount is commingled with regular IRA assets, you can't withdraw the money at a later date for deposit into an employer's 401(k) plan.

# COMPANY CONTRIBUTIONS

The Citigroup 401(k) Plan will continue to make company contributions to the accounts of eligible employees. You can refer to your current 401(k) plan prospectus for details of your plan's company contribution.

Currently, Citigroup has three company contributions:

- **Special Company Contribution:** Generally for employees of CitiFinancial, National Benefit Life Insurance Company, Primerica, Salomon Smith Barney, Citigroup Investment Group, CitiStreet LLC Retirement Services Division (formerly Copeland Associates), Travelers Property Casualty, Travelers Life and Annuity, and Travelers Insurance Company, and their participating subsidiaries.

- **Citibuilder Company Contribution:** Generally for employees of Citibank, Citigroup Corporate (excluding the Investment Group), CitiStreet LLC (Total Benefits Outsourcing and Institutional Divisions), and, for 2001, The Associates.

- **Aetna Supplemental Contribution:** For eligible employees who participated in the Retirement Plan for Employees of Aetna Life & Casualty Company as of April 2, 1996, transferred from Aetna Casualty & Surety Company to Travelers Property Casualty, and did not transfer back to Aetna prior to January 1, 1997. Additionally, employees who were continuously employed by Aetna immediately prior to and after April 2, 1996, and then transferred to Travelers Property Casualty between April 3 and December 31, 1996, also are eligible.

**FEES**

The plan will continue to assess fees from participant accounts to cover custodial, investment management and recordkeeping expenses. Fees are deducted daily. Participants currently receive information on the fee structure will be available in July.

# CHANGES IN PLAN RULES AND PROCEDURES

Currently, there are some rules and procedures that differ between the Travelers Group and Citibuilder 401(k) plans. Under the Citigroup 401(k) Plan, the rules and procedures will be the same for all participants.

| If you participate in the: |  |
|---|---|
| **Travelers Group 401(k) Savings Plan** | The $50 fee currently charged with each loan processed will be eliminated with loan applications filed beginning July 20. |
|  | The cutoff time to complete transactions, such as transferring funds, will be extended from 3 p.m. to 4 p.m. Eastern time on weekdays. |
|  | In-service withdrawals will be processed each week, instead of weekly. |
|  | If your loan payments were calculated on a basis that does not match your pay frequency, payments will be recalculated and should result in a slightly lower deduction per pay period. In July, CitiStreet will notify you of your new payment amount effective with the last pay period in July. |
|  | You can reallocate your plan balance by percentage or dollar amount. |
| **Travelers Group 401(k) Savings Plan and you're on the PeopleSoft (Hartford) payroll** | Loans will be renumbered and will show on your pay statement/advice of deposit as "LOAN 01" and "LOAN 02" rather than being numbered consecutively for each loan you have ever taken from the plan. |
| **Citibuilder 401(k) Plan** | If you're an active employee and request a hardship plan in-service withdrawal, the minimum amount will be $500 or your account balance, if less (currently the plan does not have a minimum withdrawal amount). |
|  | The minimum loan amount will be $1,000, increased from the current minimum of $500. |
|  | You can reallocate your plan balance by percentage or dollar amount. |

# HOW TO CONTACT THE CITIGROUP 401(K) PLAN

**By telephone**
Beginning July 2 through July 19, when you choose the 401(k) plan option of ConnectOne or the Employee Information & Services Line (EISL), you'll automatically be connected with a CitiStreet representative who can answer general questions and provide general information about the Citigroup 401(k) Plan. However, the representative won't be able to access account information and can't answer questions about your account balance or personal situation. You also won't be able to complete plan transactions during this time.

Beginning July 20, you'll be connected to the CitiStreet voice response unit (VRU). Automated services will be available:
- From 6 a.m. to 11:50 p.m. Eastern time, if you call the plan through ConnectOne or
- 24 hours a day, if you call the plan through EISL.

Representatives will be available from 8 a.m. to 8 p.m. Eastern time on weekdays, excluding New York Stock Exchange holidays.

**Online**
The Citigroup 401(k) Plan Web site is expected to be "live" July 20. You can visit the new site from work, if you have intranet access, or from home, if you have Internet access. To visit the site, you'll need a PIN (personal identification number). CitiStreet will mail a PIN to your home in early July. *This is not the same PIN or password that you're using to visit your current 401(k) plan Web site. This will be a new PIN.*

If you have a new home address and haven't notified Citigroup, see "How to report a change of address" on page 8.

## ARE YOU REPAYING A LOAN VIA DIRECT DEBIT?

If you have a loan from either the Travelers Group or Citibuilder plans that you're repaying by direct debit from a checking or savings account, here's what will happen:

- **If you're an active employee and your pay will cover the amount of your loan payment:** Your last direct debit will occur in late June. Then, beginning in late July or early August, your loan payment automatically will be deducted from your pay. You'll receive additional information later this month.

- **If you're an active employee but your pay will _not_ cover the amount of your loan payment:** Your last direct debit will occur in late June. Information will be mailed to your home later this month so you can (1) authorize CitiStreet, as the new plan recordkeeper, to directly debit your account for your loan payment and (2) arrange to make your loan payment by check or money order until the debit authorization is completed.

- **If you're an active employee on a non-U.S. payroll or an inactive employee:** Your last direct debit will occur in late June. Information will be mailed to your home later this month so you can (1) authorize CitiStreet, as the new plan recordkeeper, to directly debit your account for your loan payment and (2) arrange to make your loan payment by check or money order until the debit authorization is completed.



## WATCH YOUR MAILBOX

**In July, you'll receive a Citigroup 401(k) Plan prospectus and fund information at your work location.**

**If your pay is mailed to your home or you're on a leave of absence at that time, your plan information will be mailed to your home.**

## IF YOU TERMINATE EMPLOYMENT BETWEEN NOW AND JUNE 29 AND PARTICIPATE IN THE TRAVELERS GROUP 401(K) SAVINGS PLAN

[illegible]

[illegible]

[illegible]

## How to report a change of address

Be sure to notify Citigroup any time you have a change of home or work address or telephone number. Here's how:

- **If you're a U.S. employee paid by Citibank:** Call EISL at 1-800-947-2484. From the main menu, choose the Compensation Services option and then follow the prompts for address changes from 9 a.m. to 6 p.m. Eastern time on weekdays, excluding holidays. For text telephone service, call 1-800-947-1940.
- **If you're an expatriate employee paid by Citibank:** Contact William Webber in the Global Expatriate Operations & Services Unit.
- **If you're a U.S. or expatriate staff employee on the Salomon Smith Barney payroll:** You either can complete a Personnel Information Change (PIC) Form, or update your information online. Both the form and the online feature are available on the HR Web.

  From the HR Web home page, click on "Forms/Directories," "Forms," and either the Personnel Information Change Application to report your new address online or the Personnel Information Change Form, which you can print, complete, and return to your HR representative. When you change your work location, you must coordinate the change of address with your manager.
- **If you're a CitiFinancial employee:** Report any change of address on an Employee Worksheet, which you can obtain from your manager, and fax to Central Records at 410-332-7972. You must include your name, Social Security number, and effective date of the address change as well as your new address/telephone number.
- **If you're a U.S. employee on the PeopleSoft (Hartford) payroll (excluding CitiFinancial employees):** Report any change of address to your department payroll representative (DPR) who will update your home or work address on your behalf.



This newsletter is neither a contract nor a guarantee of continued employment for any definite period of time. Your employment is always on an at-will basis. Citigroup reserves the right to change or to discontinue any part or all of the benefits coverage or any fund offering described here at any time. In the event of a conflict between this newsletter and the official plan documents, the official plan documents will control.

# EXHIBIT 2



# CITIGROUP PLAN

# INVESTMENT OPTIONS

## JULY 1, 2001



# CONTENTS

| | |
|---|---|
| Citigroup Common Stock Fund | 1 |
| Stable Value Fund | 2 |
| Smith Barney Money Funds Cash Portfolio Fund | 3 |
| Fixed-Income Securities Fund | 4 |
| Smith Barney Government Securities Fund | 5 |
| Smith Barney Diversified Strategic Income Fund | 6 |
| Salomon Brothers High Yield Bond Fund | 7 |
| Conservative Focus Fund | 8 |
| Moderate Focus Fund | 9 |
| Aggressive Focus Fund | 10 |
| S&P 500 Index Fund | 11 |
| Smith Barney Appreciation Fund | 12 |
| Smith Barney Large Cap Growth Fund | 13 |
| Smith Barney Large Cap Value Fund | 14 |
| Salomon Brothers Investors Value Fund | 15 |
| State Street Global Advisors Russell 2000 Index Strategy Fund | 16 |
| Smith Barney Aggressive Growth Fund | 17 |
| Smith Barney International All Cap Growth Fund | 18 |
| International Securities Fund | 19 |
| EuroPacific Growth Fund | 21 |
| Templeton Developing Markets Trust Fund | 22 |
| Van Kampen American Capital Emerging Growth Fund | 23 |
| Van Kampen American Capital Enterprise Fund | 24 |
| Van Kampen American Capital Comstock Fund | 25 |
| Van Kampen American Capital Government Securities Fund | 26 |
| Salomon Brothers Capital Fund | 27 |
| Salomon Brothers Institutional Money Market Fund | 28 |
| State Street Common Stock Fund | 29 |
| American Express Common Stock Fund | 30 |

THE FOLLOWING INFORMATION IS PRESENTED FOR ILLUSTRATIVE PURPOSES ONLY. BEFORE MAKING ANY INVESTMENT DECISIONS, OBTAIN A COPY OF THE MOST RECENT MUTUAL FUND PROSPECTUSES AND READ THEM CAREFULLY.

# CITIGROUP COMMON STOCK FUND

*Fund type:*   Equity/growth

*Objective:*   Long-term capital appreciation

*Description:*   The fund invests only in shares of Citigroup Inc. (C) common stock, which is retained in this fund regardless of market fluctuations. In the normal course, cash equivalents will be held to meet administrative and distribution requirements.

## Performance history for periods ending March 31, 2001

| First quarter | One year | Three years* | Five years* |
|---------------|----------|--------------|-------------|
| –11.6 | 2.1 | 15.6 | 33.9 |

*Annualized rates

Note: Rates of return after January 1999 reflect Travelers Group 401(k) Savings Plan performance; rates of return prior to January 1999 reflect the performance of the underlying stock.

1

# STABLE VALUE FUND

*Fund type:*    Fixed income

*Objective:*    Preserve investment principal and provide a stable rate of return in excess of a money market fund over a full investment cycle

*Description:*    The fund invests in high-quality insurance products including guaranteed interest contracts, insurance company separate accounts, and general account insurance contracts. The fund is concentrated with insurance contracts and separate account products from Travelers Life & Annuity.

*Fund adviser:*    Travelers Life & Annuity and Citigroup Asset Management

**Performance history for periods ending March 31, 2001**

| First quarter | One year | Three years | Five years |
|:---:|:---:|:---:|:---:|
| 1.6 | 6.5 | 6.3 | 6.3 |

Note: Rates of return as reported in the Citibuilder 401(k) Plan.

2

# SMITH BARNEY MONEY FUNDS
# CASH PORTFOLIO FUND
**(Class Z shares)**

*Fund type:*      Fixed income-short term

*Objective:*     Maximize income and preserve capital through fixed-income, short-term, high-quality
                 investments

*Description:*   The fund invests in U.S. government obligations, high-quality commercial paper and other short-
                 term obligations, corporate obligations, and municipal obligations.

*Fund adviser:*  Smith Barney Fund Management LLC (successor to SSB Citi Fund Management LLC), an
                 affiliate of Salomon Smith Barney Inc., which is a subsidiary of Citigroup

## Performance history for periods ending March 31, 2001

| First quarter | One year | Three years* | Five years* |
|---|---|---|---|
| 1.4 | 6.2 | 5.4 | 5.3 |

*Annualized rates

Note: Rates of return after January 1999 reflect Travelers Group 401(k) Savings Plan performance; rates of return
prior to January 1999 reflect the performance of the underlying mutual fund.

3

# FIXED-INCOME SECURITIES FUND

*Fund type:*     Fixed income

*Objective:*     Obtain returns slightly higher than Lehman Intermediate Government/Corporate Bond Index

*Description:*   The fund is designed to be an enhanced fixed-income index fund and should offer a return that's close to the index return with modest outperformance potential.

*Fund adviser:*  Invesco Trust Company

*Benchmarks*     Lehman Intermediate Government/Corporate Bond Index
                 Lipper Intermediate Investment Grade Fixed Income Funds

### Performance history for periods ending March 31, 2001

| First quarter | One year | Three years* | Five years* |
|---|---|---|---|
| 3.2 | 11.9 | 6.8 | 7.1 |

* Annualized rates.

Note: Rates of return reflect Citibuilder 401(k) Plan performance.

### Asset allocation, March 31, 2001

| | |
|---|---|
| Cash | 1.2% |
| Government | 50.6 |
| Corporate | 40.1 |
| Other | 8.1 |
| | 100.0% |

### Maturity, March 31, 2001

| | |
|---|---|
| Less than 1 year | 16.0% |
| 1-2 years | 19.1 |
| 3-5 years | 24.5 |
| 6+ years | 40.4 |
| | 100.0% |

# SMITH BARNEY GOVERNMENT SECURITIES FUND
**(Class Z shares)**

*Fund type:*  Fixed income (core fixed income-government)

*Objective:*  High current return

*Description:*  The fund seeks to achieve its objective through investments, primarily in debt securities issued or guaranteed by the U.S. government, its agencies, or its instrumentalities. These include U.S. Treasury and mortgage-rated securities.

*Fund adviser:*  Smith Barney Fund Management LLC (successor to SSB Citi Fund Management LLC), an affiliate of Salomon Smith Barney Inc., which is a subsidiary of Citigroup

## Performance history for periods ending March 31, 2001

| First quarter | One year | Three years* | Five years* |
|---|---|---|---|
| 2.0 | NA | NA | NA |

*Annualized rates

Note: Rates of return after January 1999 reflect Travelers Group 401(k) Savings Plan performance; rates of return prior to January 1999 reflect the performance of the underlying mutual fund.

## Asset allocation, March 31, 2001

| | |
|---|---|
| Government mortgage-backed securities | 39.4% |
| Treasury bonds | 28.6 |
| Agency bonds (non-MBS) | 27.7 |
| Treasury strips | 2.0 |
| Corporate mortgage-backed securities | 0.4 |
| Corporate bonds/notes | 0.1 |
| Cash and other net assets | 1.8 |
| | 100.0% |

5

# SMITH BARNEY DIVERSIFIED STRATEGIC INCOME FUND
*(Class Z shares)*

*Fund type:*    Global fixed income

*Objective:*    High current income

*Description:*    The fund invests primarily in three types of fixed income securities: U.S. government securities and U.S. government mortgage-rated securities; foreign government securities, including securities issued by supranational organizations; and U.S. and foreign corporate debt securities.

*Fund adviser:*    Smith Barney Fund Management LLC (successor to SSB Citi Fund Management LLC), an affiliate of Salomon Smith Barney Inc., which is a subsidiary of Citigroup

## Performance history for periods ending March 31, 2001

| First quarter | One year | Three years* | Five years* |
|:---:|:---:|:---:|:---:|
| 2.2 | 4.3 | 3.0 | 5.7 |

*Annualized rates

Note: Rates of return after January 1999 reflect Travelers Group 401(k) Savings Plan performance; rates of return prior to January 1999 reflect the performance of the underlying mutual fund.

## Asset allocation, March 31, 2001

| | |
|---|---:|
| Government | 50.0% |
| High yield | 30.0 |
| Foreign | 20.0 |
| | 100.0% |

## Top 5 sectors (high-yield sector), March 31, 2001

| | |
|---|---:|
| Cable/satellite TV | 13.6% |
| Specialty telecom | 11.1 |
| Wireless telecom | 8.5 |
| Containers/packaging | 4.1 |
| Oil and gas production | 3.7 |

## Country allocation (foreign portion), March 31, 2001

| | |
|---|---:|
| Europe | 32.1% |
| United Kingdom | 21.7 |
| Denmark | 20.0 |
| Sweden | 18.8 |
| New Zealand | 7.4 |

6

# SALOMON BROTHERS HIGH YIELD BOND FUND
**(Class O shares)**

**Fund type:** Fixed income (U.S. high-yield fixed income)

**Objective:** Maximize current income; capital appreciation is a secondary objective

**Description:** The fund invests primarily in high-yield, fixed-income securities issued by U.S. and foreign corporations and foreign governments and their agencies and instrumentalities. The fund will limit its investments in emerging market governmental issuers to 35% of its assets.

**Fund adviser:** Salomon Brothers Asset Management, Inc. (SBAM)

## Performance history for periods ending March 31, 2001

| First quarter | One year | Three years* | Five years* |
|---|---|---|---|
| 3.5 | 0.7 | -1.2 | 5.7 |

*Annualized rates

Note: Rates of return after January 1999 reflect Travelers Group 401(k) Savings Plan performance; rates of return prior to January 1999 reflect the performance of the underlying mutual fund.

## Asset allocation, March 31, 2001

| | |
|---|---|
| U.S. high-yield bonds | 54.5% |
| Emerging markets debt | 34.6 |
| Cash | 10.9 |
| | 100.0% |

7

# CONSERVATIVE FOCUS FUND

*Fund type:*      Fixed/equity

*Objective:*     Match the return of the composite asset mix, which is designed to seek as high a total return over time as is consistent with a primary emphasis on a combination of fixed-income and money market securities and a secondary emphasis on equity securities

*Description:*    The fund invests in a mix of fixed-income and equity funds. The fund is managed to approximate this target portfolio mix. The fund is rebalanced monthly or more often when justified by significant activity or changes in the market values of the underlying funds.

*Fund adviser:*   State Street Global Advisors

## Performance history for periods ending March 31, 2001

| First quarter | Six months | Nine months |
|:---:|:---:|:---:|
| -1.2 | -0.8 | 0.0 |

Note: Rates of return reflect Citibuilder 401(k) Plan performance.

8

# MODERATE FOCUS FUND

*Fund type:*      Fixed/equity

*Objective:*      Match the return of the composite asset mix, which is designed to seek as high a total return over time as is consistent with a balanced emphasis on equity, fixed-income, and money market securities

*Description:*    The fund invests in a mix of fixed-income and equity funds and is managed to approximate this target portfolio mix. The fund is rebalanced monthly or more often when justified by significant activity or changes in the market values of the underlying funds.

*Fund adviser:*   State Street Global Advisors

## Performance history for periods ending March 31, 2001

| First quarter | Six months | Nine months |
|---------------|------------|-------------|
| -4.7 | -6.7 | -7.3 |

Note: Rates of return reflect Citibuilder 401(k) Plan performance.

9

# AGGRESSIVE FOCUS FUND

*Fund type:*     Fixed/equity

*Objective:*     Match the return of the composite asset mix, which is designed to seek as high a total return over time as is consistent with a primary emphasis on equity securities and a secondary emphasis on fixed-income and money market securities

*Description:*     The fund invests in a mix of fixed-income and equity funds and is managed to approximate this target portfolio mix. The fund is rebalanced monthly or more often when justified by significant activity or changes in the market values of the underlying funds.

*Fund adviser:*     State Street Global Advisors

**Performance history for periods ending March 31, 2001**

| First quarter | Six months | Nine months |
|---------------|------------|-------------|
| -8.1          | -12.3      | -14.2       |

Note: Rates of return reflect Citibuilder 401(k) Plan performance.

# S&P 500 INDEX FUND

*Fund type:*  Equity/growth

*Objective:*  Replicate the S&P 500 Index as closely as possible

*Description:*  The fund invests in an index fund that replicates the composition of the S&P 500 Index, and the return for the fund is expected to be very close to that of the S&P 500. Cash balances that the fund receives from dividends, as well as cash balances maintained to provide liquidity associated with contributions and withdrawals, are temporarily invested in S&P stock index futures contracts to remain as fully invested as possible.

*Fund adviser:*  Invesco Trust Company

*Benchmarks:*  S&P 500 Index
Lipper Large Cap Core Funds

### Performance history for periods ending March 31, 2001

| First quarter | One year | Three years* | Five years* |
|---|---|---|---|
| -11.9 | -21.8 | 3.0 | 14.2 |

\* Annualized rates.

Note: Rates of return reflect Citibuilder 401(k) Plan performance.

### Top 10 holdings, March 31, 2001

| | |
|---|---|
| General Electric | 4.0% |
| Microsoft | 2.8 |
| ExxonMobil | 2.7 |
| Pfizer | 2.5 |
| Citigroup | 2.2 |
| Wal-Mart Stores | 2.2 |
| American International Group | 1.8 |
| Intel | 1.7 |
| Merck & Co. | 1.7 |
| AOL Time Warner | 1.7 |

### Sector allocation, March 31, 2001

| | |
|---|---|
| Financials | 20.15% |
| Technology | 19.28 |
| Health care | 13.12 |
| Consumer goods (noncyclical) | 7.63 |
| Consumer goods (cyclical) | 7.57 |
| Energy | 7.11 |
| Telecommunications | 5.90 |
| Consumer services | 5.06 |
| Basic materials | 4.39 |
| Industrials | 3.30 |
| Utilities | 2.94 |
| Commercial services | 2.79 |
| Transportation | 0.76 |

# SMITH BARNEY APPRECIATION FUND
**(Class Z shares)**

*Fund type:* Equity (active large-cap core equity)

*Objective:* Long-term capital appreciation

*Description:* The fund invests primarily in equity securities of U.S. companies. The fund typically invests in medium- and large-capitalization companies and may invest in small-capitalization companies. Equity securities include exchange-traded and over-the-counter common stocks and preferred stocks, debt securities convertible into equity securities, and warrants and rights relating to equity securities.

*Fund adviser:* Smith Barney Fund Management LLC (successor to SSB Citi Fund Management LLC), an affiliate of Salomon Smith Barney Inc., which is a subsidiary of Citigroup

## Performance history for periods ending March 31, 2001

| First quarter | One year | Three years* | Five years* |
|---|---|---|---|
| -6.3 | -6.9 | 6.1 | 13.9 |

*Annualized rates

Note: Rates of return after January 1999 reflect Travelers Group 401(k) Savings Plan performance; rates of return prior to January 1999 reflect the performance of the underlying mutual fund.

## Top 10 holdings, March 31, 2001

| | |
|---|---|
| Berkshire Hathaway | 5.7% |
| ExxonMobil | 3.3 |
| General Electric | 3.1 |
| Microsoft | 2.9 |
| American Intl. Group | 2.4 |
| Pfizer | 2.4 |
| AOL Time Warner | 2.3 |
| Kimberly Clark | 2.1 |
| Household International | 1.9 |
| Sbc Communications | 1.7 |

## Sector allocation, March 31, 2001

| | |
|---|---|
| Finance | 18.1% |
| Technology | 11.5 |
| Health | 10.1 |
| Industrial | 10.0 |
| Communications and media | 9.6 |

# SMITH BARNEY LARGE CAP GROWTH FUND
**(Class Z shares)**

*Fund type:*       Equity/growth

*Objective:*       Long-term growth of capital

*Description:*    The fund invests primarily in equity securities of companies with large market capitalizations. Large-capitalization companies are those with total market capitalizations of $5 billion or more at the time of investment. Equity securities include U.S. exchange-traded and over-the-counter common stocks, debt securities convertible into equity securities, and warrants and rights relating to equity securities.

*Fund adviser:*  Smith Barney Fund Management LLC (successor to SSB Citi Fund Management LLC), an affiliate of Salomon Smith Barney Inc., which is a subsidiary of Citigroup

## Performance history for periods ending March 31, 2001

| Fourth quarter | One year | Three years* | Five years* |
|---|---|---|---|
| –14.1 | –27.0 | 11.4 | NA |

*Annualized rates

Note: Rates of return after January 1999 reflect Travelers Group 401(k) Savings Plan performance; rates of return prior to January 1999 reflect the performance of the underlying mutual fund.

## Top 10 holdings, March 31, 2001

| | |
|---|---|
| Pfizer | 6.4% |
| Merrill Lynch | 5.1 |
| Berkshire Hathaway | 4.8 |
| Texas Instruments | 4.7 |
| Wells Fargo Bank | 4.6 |
| Intel | 4.6 |
| Amgen | 4.3 |
| AOL Time Warner | 4.1 |
| Household International | 4.1 |
| Gillette | 4.0 |

## Top 5 sectors, March 31, 2001

| | |
|---|---|
| Finance | 29.2% |
| Technology | 29.1 |
| Health | 17.6 |
| Consumer nondurables | 12.9 |
| Retail | 3.8 |

13

# SMITH BARNEY LARGE CAP VALUE FUND
(Class Z shares)

*Fund type:*   Equity/value

*Objective:*   Current income and long-term growth of income and capital

*Description:*  The fund invests primarily in common stocks of U.S. companies having market capitalizations of at least $5 billion at the time of investment.

*Fund adviser:*  Smith Barney Fund Management LLC (successor to SSB Citi Fund Management LLC), an affiliate of Salomon Smith Barney Inc., which is a subsidiary of Citigroup

## Performance history for periods ending March 31, 2001

| First quarter | One year | Three years* | Five years* |
|:---:|:---:|:---:|:---:|
| -6.3 | 3.7 | 2.7 | 11.6 |

*Annualized rates

Note: Rates of return after January 1999 reflect Travelers Group 401(k) Savings Plan performance; rates of return prior to January 1999 reflect the performance of the underlying mutual fund.

## Top 10 holdings, March 31, 2001

| | |
|---|---:|
| ExxonMobil | 4.0% |
| Mellon Bank | 3.5 |
| J.P. Morgan Chase | 3.2 |
| Verizon Communications | 3.0 |
| Kimberly Clark | 3.0 |
| Duke Energy | 2.9 |
| Wells Fargo Bank | 2.8 |
| Bristol-Myers Squibb | 2.7 |
| BankAmerica | 2.7 |
| Williams Companies | 2.6 |

## Top 5 sectors, March 31, 2001

| | |
|---|---:|
| Finance | 23.9% |
| Energy | 19.6 |
| Industrial | 18.0 |
| Health | 9.3 |
| Communications and media | 8.7 |

14

# SALOMON BROTHERS INVESTORS VALUE FUND
**(Class O shares)**

**Fund type:**   Equity/value

**Objective:**   Long-term growth of capital; current income is a secondary objective

**Description:**   The fund invests primarily in common stocks of established U.S. companies. The fund also may invest in other equity securities. To a lesser degree, the fund invests in income-producing securities, such as debt securities.

**Fund adviser:**   Salomon Brothers Asset Management, Inc. (SBAM)

## Performance history for periods ending March 31, 2001

| First quarter | One year | Three years* | Five years* |
|---|---|---|---|
| -3.2 | 6.4 | 9.1 | 17.2 |

*Annualized rates

Note: Rates of return after January 1999 reflect Travelers Group 401(k) Savings Plan performance; rates of return prior to January 1999 reflect the performance of the underlying mutual fund.

## Top 10 holdings, March 31, 2001

| | |
|---|---|
| Verizon Communications | 2.9% |
| Williams Companies | 2.9 |
| Alcoa | 2.3 |
| Washington Mutual | 2.2 |
| Compaq Computer | 2.2 |
| The Bank of New York | 1.9 |
| Fleetboston Financial | 1.9 |
| Kimberly-Clark | 1.9 |
| Household International | 1.9 |
| Federated Department Stores | 1.8 |

15

# STATE STREET GLOBAL ADVISORS
# RUSSELL 2000 INDEX STRATEGY FUND

*Fund type:*     Equity (passive aggressive growth)

*Objective:*     Replicate the returns and characteristics of the Russell 2000 Index

*Description:*   The Russell 2000 Index is composed of 2,000 stocks whose average market capitalization is less than $1 billion. (Market capitalization is the product of a company's common shares outstanding times its market price.) The index is a proxy for the small-cap sector of the U.S. equity market. Cash balances that the fund receives may be invested temporarily in stock index futures contracts to remain as fully invested as possible.

*Fund adviser:*  State Street Global Advisors

## Performance history for periods ending March 31, 2001

| First quarter | One year | Three years* | Five years* |
|:---:|:---:|:---:|:---:|
| -6.4 | -15.2 | -1.3 | 7.8 |

*Annualized rates

Note: Rates of return after January 1999 reflect Travelers Group 401(k) Savings Plan performance; rates of return prior to January 1999 reflect the performance of the underlying mutual fund.

## Top 10 holdings, March 31, 2001

| | |
|---|---:|
| Caremark RX | 0.4% |
| Abercrombie and Fitch | 0.4 |
| Amerisource Health | 0.3 |
| Americredit | 0.3 |
| Centex | 0.3 |
| Astoria Financial Group | 0.3 |
| MDU RES Group | 0.3 |
| Bergen Brunswig | 0.3 |
| Gallagher Arthur J + Co | 0.3 |
| Health Net | 0.3 |

## Sector allocation, March 31, 2001

| | |
|---|---:|
| Financials | 22.4% |
| Consumer discretionary | 16.8 |
| Industrials | 14.1 |
| Information technology | 12.9 |
| Health care | 12.8 |
| Materials | 5.7 |
| Utilities | 5.4 |
| Energy | 4.6 |
| Consumer staples | 4.2 |
| Telecommunication services | 1.1 |

# SMITH BARNEY AGGRESSIVE GROWTH FUND
**(Class Z shares)**

*Fund type:*     Equity/small growth

*Objective:*     Capital appreciation

*Description:*     The fund invests primarily in common stocks of companies that the manager believes are experiencing, or will experience, growth in earnings that exceeds the average rate of earnings growth of the companies that comprise the S&P 500 Index. The fund may invest in the securities of large, well-known companies that offer prospects of long-term earnings growth. However, because higher earnings growth rates are often achieved by small- to medium-sized companies, a significant portion of the fund's assets are invested in the securities of such companies.

*Fund adviser:*     Smith Barney Fund Management LLC (successor to SSB Citi Fund Management LLC), an affiliate of Salomon Smith Barney Inc., which is a subsidiary of Citigroup

## Performance history for periods ending March 31, 2001

| First quarter | One year | Three years* | Five years* |
|---|---|---|---|
| -10.3 | -10.6 | 27.0 | 26.1 |

*Annualized rates

Note: Rates of return after January 1999 reflect Travelers Group 401(k) Savings Plan performance; rates of return prior to January 1999 reflect the performance of the underlying mutual fund.

## Top 10 holdings, March 31, 2001

| | |
|---|---|
| Genzyme | 5.2% |
| Comcast | 5.1 |
| Tyco International | 5.0 |
| United Healthcare | 5.0 |
| Forest Laboratories | 5.0 |
| Lehman Brothers | 4.9 |
| Chiron | 4.7 |
| AOL Time Warner | 4.5 |
| Cablevision Systems | 4.4 |
| Micron Tech | 4.3 |

## Top 5 sectors, March 31, 2001

| | |
|---|---|
| Health | 35.9% |
| Technology | 20.6 |
| Communications and media | 16.7 |
| Finance | 9.2 |
| Energy | 5.8 |

17

# SMITH BARNEY INTERNATIONAL ALL CAP GROWTH FUND
**(Class Z shares)**

*Fund type:*     Equity (international core equity)

*Objective:*     Total return on its assets from growth of capital and income

*Description:*   The fund invests primarily in equity securities of foreign companies. Equity securities include exchange-traded and over-the-counter common stocks and preferred shares, debt securities convertible into equity securities, and warrants and rights relating to equity securities.

*Fund adviser:*  Smith Barney Fund Management LLC (successor to SSB Citi Fund Management LLC), an affiliate of Salomon Smith Barney Inc., which is a subsidiary of Citigroup

## Performance history for periods ending March 31, 2001

| First quarter | One year | Three years* | Five years* |
|---|---|---|---|
| -20.8 | -44.4 | -5.2 | 1.5 |

*Annualized rates

Note: Rates of return after January 1999 reflect Travelers Group 401(k) Savings Plan performance; rates of return prior to January 1999 reflect the performance of the underlying mutual fund.

## Top 10 holdings, March 31, 2001

| | |
|---|---|
| Tomra | 4.9% |
| Grafton Group | 4.5 |
| Capita Group | 4.0 |
| Serco | 4.0 |
| Novartis | 3.8 |
| Mettler-Toledo | 3.6 |
| Nokia | 3.5 |
| Hutchison Whampoa | 3.5 |
| Hays | 3.2 |
| Misys | 3.1 |

## Regional allocation, March 31, 2001

| | |
|---|---|
| Europe | 70.6% |
| Asia/Pacific Rim | 21.8 |
| The Americas | 6.5 |
| Other | 1.5 |

18

# INTERNATIONAL SECURITIES FUND

*Fund type:*     Equity/international

*Objective:*     Long-term capital appreciation by investing approximately 90% of its assets in stocks in developed markets and approximately 10% of its assets in stocks in emerging markets

*Description:*     The fund invests 90% of its assets in the DFA International Value Portfolio IV and 10% in the Emerging Markets Portfolio II. Each portfolio is a separate fund managed by Dimensional Fund Advisors Inc. (DFA).

DFA's philosophy is to create its own index of stocks to invest in internationally based on the following:

The DFA International Value Portfolio IV invests in large non-U.S.-based companies in developed countries whose stocks DFA deems value stocks, typically because the shares have higher book value in relations to their market value. Generally, investment are in companies whose market capitalization (shares outstanding times market price) exceeds $800 million and whose book-to-market ratio is in the top 30% of all companies of each country. DFA generally invests in the same countries as are found in the Morgan Stanley Europe, Australasia, Far East Index (EAFE), a widely followed international index for developed countries.

The Emerging Markets Portfolio II invests in stocks of companies in countries whose economies have the potential for rapid economic growth. These countries are located in regions such as Southeast Asia, Latin America, and the Middle East. The portfolio will invest in companies whose market capitalization ranking by size is in the top 40th-75th percentile of the total market capitalization of public companies in the country.

This type of fund has little portfolio turnover compared to actively managed funds. Investments typically are disposed of only when they no longer meet the portfolio's criteria.

*Fund adviser:*     Dimensional Fund Advisors Inc.

*Benchmarks:*     Lipper International Fund
90% EAFE Index/10% Morgan Stanley Emerging Markets Free Index

19

# INTERNATIONAL SECURITIES FUND
(continued)

### Performance history for periods ending March 31, 2001

| First quarter | One year | Three years* | Five years* |
|---|---|---|---|
| -8.9 | -7.2 | 1.0 | 4.3 |

*The investment objective of this fund was changed in August 1997.*
 *Annualized rates.

Note: Rates of return reflect Citibuilder 401(k) Plan performance.

### Top 10 holdings, March 31, 2001

| | |
|---|---|
| ING Groep NV | 2.94% |
| Matsushita Electrical Industrial | 2.12 |
| Hitachi | 1.93 |
| Deutsche Bank AG | 1.67 |
| BNP Paribas | 1.66 |
| Baloise-Holding | 1.64 |
| CGNU | 1.56 |
| BASF AG | 1.54 |
| ABN-AMRO Holdings NV | 1.52 |
| Richemont (CIE FIN) | 1.23 |

### Country allocation, March 31, 2001

| | |
|---|---|
| Japan | 18.42% |
| United Kingdom | 16.62 |
| Germany | 8.82 |
| France | 8.73 |
| Netherlands | 6.60 |
| Switzerland | 5.82 |
| Italy | 3.26 |
| Spain | 3.06 |
| Hong Kong | 2.50 |
| Sweden | 1.97 |
| All others | 24.20 |
| **Total** | **100.00%** |

# EUROPACIFIC GROWTH FUND

**Fund type:**   Equity (international core equity)

**Objective:**   Long-term growth of capital by investing in companies based outside the U.S, primarily in Europe or the Pacific Basin

**Description:**   The fund's assets may be invested in common stocks; securities convertible into common stocks, warrants and rights; straight debt securities; government securities; nonconvertible preferred stocks; repurchase agreements; and cash or cash equivalents. Holdings range from small firms to multinational corporations located in major world markets as well as in smaller, developing countries.

**Fund adviser:**   Capital Research and Management Company

## Performance history for periods ending March 31, 2001

| First quarter | One year | Three years* | Five years* |
|---|---|---|---|
| -8.4 | -28.1 | 6.3 | 11.0 |

*Annualized rates

Note: Rates of return after January 1999 reflect Travelers Group 401(k) Savings Plan performance; rates of return prior to January 1999 reflect the performance of the underlying mutual fund.

## Top 10 holdings, March 31, 2001

| | |
|---|---|
| AstraZeneca | 4.05% |
| Vodafone Group | 2.67 |
| Elan | 2.10 |
| Samsung Electronics | 1.82 |
| Taiwan Semiconductor Manufacturing | 1.48 |
| Hon Hai Precision Industry | 1.48 |
| Royal Dutch Petroleum/ "Shell" Transport and Trading | 1.46 |
| ING Groep | 1.39 |
| Vivendi Universal | 1.35 |
| Nestle | 1.33 |

## Country allocation, March 31, 2001

| | |
|---|---|
| Europe | 42.4% |
| Pacific Basin | 30.1 |
| The Americas | 5.4 |
| Other | 3.0 |

# TEMPLETON DEVELOPING MARKETS TRUST FUND

*(Class A Shares)*

*Fund type:*    Long-term capital growth

*Objective:*    Long-term appreciation

*Description:*    The fund invests primarily in equity securities of developing or emerging market issuers.

*Fund adviser:*    Templeton Asset Management Ltd., Hong Kong branch

## Performance history for periods ending March 31, 2001

| First quarter | One year | Three years* | Five years* |
|---|---|---|---|
| -6.4 | -31.3 | -9.3 | -4.5 |

*Annualized rates

Note: Rates of return after January 1999 reflect Travelers Group 401(k) Savings Plan performance; rates of return prior to January 1999 reflect the performance of the underlying mutual fund.

## Top 10 holdings, March 31, 2001

| | |
|---|---|
| Cemex SA | 5.3% |
| Grupo Financiero Banamex Accival SA de CV | 4.8 |
| Centrais Eletricas Brasileiras SA (Eletrobras) | 3.8 |
| Cheung Kong Holdings Ltd. | 3.5 |
| Sasol Ltd. | 3.1 |
| South African Breweries PLC | 2.6 |
| Samsung Electronics Company Ltd. | 2.5 |
| Banco Bradesco SA | 2.1 |
| Barloworld Ltd. | 1.9 |
| Anglo American PLC | 1.8 |

## Country allocation, March 31, 2001

| | |
|---|---|
| Asia | 37.9% |
| Latin America/Caribbean | 26.8 |
| Mideast/Africa | 19.1 |
| Europe | 12.9 |

# VAN KAMPEN AMERICAN CAPITAL EMERGING GROWTH FUND
**(Class A shares)**

*Fund type:*  Equity/growth

*Objective:*  Capital appreciation

*Description:*  The fund seeks to achieve its objective by investing in common stocks of emerging-growth companies.

*Fund adviser:*  Van Kampen American Capital Asset Management, Inc.

*Restrictions:*  This fund is closed to new participants. In addition, participants currently contributing to the fund who change their investment direction to the fund to zero cannot re-enter the fund.

## Performance history for periods ending March 31, 2001

| First quarter | One year | Three years* | Five years* |
|---|---|---|---|
| -23.4 | -46.1 | 17.1 | 20.1 |

*Annualized rates

Note: Rates of return after January 1999 reflect Travelers Group 401(k) Savings Plan performance; rates of return prior to January 1999 reflect the performance of the underlying mutual fund.

## Top 10 holdings, March 31, 2001

| | |
|---|---|
| United Health Group | 2.2% |
| Cardinal Health | 2.0 |
| Check Point Software Technologies | 1.9 |
| Calpine | 1.9 |
| Anadarko Petroleum | 1.8 |
| Lehman Brothers Holdings | 1.8 |
| Kohl's | 1.7 |
| Lowes Cos. | 1.7 |
| AES | 1.6 |
| Baxter International | 1.5 |

## Top 10 sectors, March 31, 2001

| | |
|---|---|
| Financials (diversified) | 4.9% |
| Electric utilities | 4.7 |
| Oil and gas (exploration/production) | 4.6 |
| Application software | 4.5 |
| Oil and gas equipment and services | 3.9 |
| Aerospace and defense | 3.8 |
| Pharmaceuticals | 3.8 |
| Telecommunications equipment | 3.2 |
| IT consulting and services | 3.1 |
| Managed health care | 2.7 |

23

# VAN KAMPEN AMERICAN CAPITAL ENTERPRISE FUND

**(Class A Shares)**

*Fund type:*    Equity/growth

*Objective:*    Capital appreciation

*Description:*    The fund focuses on common stocks of growth companies.

*Fund adviser:*    Van Kampen American Capital Asset Management, Inc.

*Restrictions:*    This fund is closed to new participants. In addition, participants currently contributing to the fund who change their investment direction to the fund to zero cannot re-enter the fund.

## Performance history for periods ending March 31, 2001

| First quarter | One year | Three years* | Five years* |
|---|---|---|---|
| -21.5 | -40.3 | -3.2 | 9.0 |

*Annualized rates

Note: Rates of return after January 1999 reflect Travelers Group 401(k) Savings Plan performance; rates of return prior to January 1999 reflect the performance of the underlying mutual fund.

## Top 10 holdings, March 31, 2001

| | |
|---|---|
| Pfizer | 3.1% |
| IBM | 3.1 |
| Safeway | 2.8 |
| General Electric | 2.3 |
| Fannie Mae | 2.1 |
| Tyco International | 2.0 |
| Phillip Morris | 2.0 |
| Microsoft | 1.8 |
| Waste Management | 1.7 |
| Cardinal Health | 1.6 |

## Top 10 sectors, March 31, 2001

| | |
|---|---|
| Pharmaceuticals | 11.6% |
| Banks | 5.9 |
| Financials (diversified) | 5.6 |
| Industrial conglomerates | 4.9 |
| Semiconductors | 4.7 |
| Food-retail | 3.7 |
| Computer hardware | 3.4 |
| Oil and gas drilling | 2.8 |
| Managed health care | 2.6 |
| Systems software | 2.6 |

24

# VAN KAMPEN AMERICAN CAPITAL COMSTOCK FUND
**(Class A Shares)**

*Fund type:*     Equity/value

*Objective:*     Capital growth and income

*Description:*   The fund emphasize a "value" style of investing, seeking well-established, undervalued companies.

*Fund adviser:*  Van Kampen American Capital Asset Management, Inc.

*Restrictions:*  This fund is closed to new participants. In addition, participants currently contributing to the fund who change their investment direction to the fund to zero cannot re-enter the fund.

## Performance history for periods ending March 31, 2001

| First quarter | One year | Three years* | Five years* |
|---------------|----------|--------------|-------------|
| -1.7 | 29.0 | 12.1 | 18.7 |

*Annualized rates

Note: Rates of return after January 1999 reflect Travelers Group 401(k) Savings Plan performance; rates of return prior to January 1999 reflect the performance of the underlying mutual fund.

## Top 10 holdings, March 31, 2001

| | |
|---|---|
| BP Amoco PLC | 3.8% |
| Chevron | 3.5 |
| Conoco | 3.3 |
| Reliant Energy | 2.6 |
| Gap | 2.6 |
| Southern Co. | 2.5 |
| Halliburton | 2.4 |
| International Paper | 2.4 |
| Sara Lee | 2.3 |
| TXU | 2.1 |

## Top 10 sectors, March 31, 2001

| | |
|---|---|
| Electric utilities | 12.9% |
| Integrated oil and gas | 11.2 |
| Property and casualty insurance | 5.1 |
| Banks | 4.6 |
| Chemicals (diversified) | 4.1 |
| Packaged foods | 3.5 |
| Paper products | 3.4 |
| Integrated telecom services | 3.0 |
| Apparel retail | 3.0 |
| Oil and gas equipment and services | 2.4 |

25

# VAN KAMPEN AMERICAN CAPITAL GOVERNMENT SECURITIES FUND

**(Class A Shares)**

*Fund type:* Fixed income (government)

*Objective:* High current return consistent with preservation of capital

*Description:* The fund invests substantially all of its assets in debt securities issued or guaranteed by the U.S. government, its agencies, or its instrumentalities, including mortgage-related securities issued or guaranteed by instrumentalities of the U.S. government.

*Fund adviser:* Van Kampen American Capital Asset Management, Inc.

*Restrictions:* This fund is closed to new participants. In addition, participants currently contributing to the fund who change their investment direction to the fund to zero cannot re-enter the fund.

## Performance history for periods ending March 31, 2001

| First quarter | One year | Three years* | Five years* |
|---|---|---|---|
| 2.4 | 11.6 | 6.0 | 6.6 |

*Annualized rates

Note: Rates of return after January 1999 reflect Travelers Group 401(k) Savings Plan performance; rates of return prior to January 1999 reflect the performance of the underlying mutual fund.

## Top 10 holdings, March 31, 2001

| | |
|---|---|
| U.S. Treasury bonds 8.0, 11/15/21 | 7.2% |
| FNMA 6.5 | 6.8 |
| U.S. Treasury bonds 8.125, 8/15/19 | 6.1 |
| FH LML 5.0, 1/15/04 | 4.9 |
| FNMA, 6.0, 15 years | 4.6 |
| US Treasury 7.5 , 11/15/01 | 3.8 |
| FNMA 7.0 | 3.8 |
| U.S. Treasury bonds 9.25, 2/15/16 | 3.2 |
| U.S. Treasury bonds 5.25, 11/15/28 | 3.1 |
| FNMA 6.5, 15 years | 2.8 |

## Top 4 sectors, March 31, 2001

| | |
|---|---|
| U.S. Treasuries | 39.1% |
| Agency pass-thru | 38.8 |
| Agency notes | 15.6 |
| Cash | 5.0 |

# SALOMON BROTHERS CAPITAL FUND
**(Class O Shares)**

*Fund type:*   Equity/growth

*Objective:*   Capital appreciation through investments primarily in common stock or securities convertible into common stock

*Description:*   The fund invests in securities believed to have above-average price appreciation potential. The fund may invest in seasoned, established companies and relatively small new companies as well as new issues. The fund will not invest more than 25% of its assets in any particular industry.

*Fund adviser:*   Salomon Brothers Asset Management, Inc. (SBAM)

*Restrictions:*   The fund is closed to new contributions.

## Performance history for periods ending March 31, 2001

| Fourth quarter | One year | Three years* | Five years* |
|----------------|----------|--------------|-------------|
| -0.6 | 4.7 | 16.7 | 22.4 |

*Annualized rates

Note: Rates of return after January 1999 reflect Travelers Group 401(k) Plan performance; rates of return prior to January 1999 reflect the performance of the underlying mutual fund.

## Top 5 holdings, March 31, 2001

| | |
|---|---|
| Safeway | 4.0% |
| Federated Dept. Stores | 3.0 |
| FleetBoston Financial | 2.9 |
| HCA - The Healthcare Co. | 2.9 |
| Costco Wholesale | 2.8 |

## Top 5 sectors, March 31, 2001

| | |
|---|---|
| Consumer staples | 18.1% |
| Health care | 14.0 |
| Communication | 12.9 |
| Cash and options | 11.1 |
| Financials | 10.3 |

# SALOMON BROTHERS INSTITUTIONAL MONEY MARKET FUND

*Fund type:*    Fixed income (short term)

*Objective:*    High level of current income as is consistent with liquidity and stability of principal

*Description:*    The fund invests in money market instruments maturing in 13 months or less whose credit ratings are either:
1. Within the two highest ratings categories of two nationally recognized statistical rating organizations; or
2. If rated by only one such organization, within the two highest ratings categories of that organization; or
3. If not rated, then believed by the investment manager to be of comparable quality.

*Fund adviser:*    Salomon Brothers Asset Management, Inc. (SBAM)

*Restrictions:*    The fund is closed to new contributions.

**Performance history for periods ending March 31, 2001**

| Fourth quarter | One year | Three years* | Five years* |
|---|---|---|---|
| 1.4 | 6.3 | 5.7 | 5.6 |

*Annualized rates

Note: Rates of return after January 1999 reflect Travelers Group 401(k) Savings Plan performance; rates of return prior to January 1999 reflect the performance of the underlying mutual fund.

28

# STATE STREET COMMON STOCK FUND

*Fund type:* Equity

*Objective:* Invest in shares of State Street common stock

*Description:* Except through dividend reinvestment, no additional State Street shares will be purchased by this fund.

*Restrictions:* The fund is closed to new contributions.

## Performance history for periods ending March 31, 2001

| First quarter | One year | Three years* | Five years* |
|---|---|---|---|
| -24.2 | -3.0 | 11.8 | 30.7 |

*Annualized rates

29

# AMERICAN EXPRESS COMMON STOCK FUND

*Fund type:*      Equity

*Objective:*      Invest in shares of American Express Company common stock

*Description:*    Except through dividend reinvestment, no additional Amex shares will be purchased by this fund.

*Restrictions:*   The fund is closed to new contributions.

## Performance history for periods ending March 31, 2001

| First quarter | One year | Three years* | Five years* |
|---------------|----------|--------------|-------------|
| -24.6 | -16.3 | 11.2 | 21.4 |

*Annualized rates

83292 CEB2015

# EXHIBIT 3

# ADMINISTRATIVE SERVICES AGREEMENT

## BETWEEN

## CITISTREET LLC

## AND

## CITIGROUP INC.

## TABLE OF CONTENTS

ARTICLE 1   BUSINESS REQUIREMENTS DOCUMENT .................................................................................1

ARTICLE 2   PARTICIPANT DATA.........................................................................................................................1

ARTICLE 3   CITISTREET'S SERVICES ................................................................................................................2

ARTICLE 4   EXPENSES.............................................................................................................................................3

ARTICLE 5   TERM AND TERMINATION ...........................................................................................................4

ARTICLE 6   AMENDMENTS ....................................................................................................................................4

ARTICLE 7   PLAN AMENDMENTS .......................................................................................................................5

ARTICLE 8   CLIENT DIRECTIONS........................................................................................................................5

ARTICLE 9   DEFAULT AND REMEDIES ..............................................................................................................6

ARTICLE 10  LIABILITY .............................................................................................................................................8

ARTICLE 11  INDEMNIFICATION ...........................................................................................................................8

ARTICLE 12  CONFIDENTIAL INFORMATION..................................................................................................10

ARTICLE 13  RIGHTS IN DELIVERABLES AND DATA....................................................................................11

ARTICLE 14  COMPLIANCE WITH LAW .............................................................................................................13

ARTICLE 15  SUBCONTRACTING AND ASSIGNMENT ...................................................................................13

ARTICLE 16   PROJECT MANAGEMENT.............................................................................................................13

ARTICLE 17  SUSPENSION OF SERVICES ..........................................................................................................14

ARTICLE 18  NOTICES .............................................................................................................................................14

ARTICLE 19  REPRESENTATIONS ........................................................................................................................15

ARTICLE 20  RELATIONSHIP OF THE PARTIES..............................................................................................16

EXHIBIT A          BRD
EXHIBIT B          Expenses
EXHIBIT C          Performance Standards

## ADMINISTRATIVE SERVICES AGREEMENT

**THIS AGREEMENT** (the "Agreement") is entered into effective as of July 1, 2001, by and between CITISTREET LLC, a Delaware limited liability company ("CitiStreet"), and Citigroup Inc. ("Client"), collectively the "Parties".

## R E C I T A L S

**WHEREAS,** Client desires that CitiStreet, its agents or its subcontractors (hereinafter collectively "CitiStreet") perform the services ("Services") as specified in the Business Requirements Document, as amended from time to time, (the "BRD"), hereto attached as Exhibit A with respect to certain employee benefit plans sponsored by the Client as listed in the BRD (the "Plans");

**WHEREAS,** CitiStreet and Client have reached agreement as to the Services to be rendered to the Plans as set forth in the BRD;

**WHEREAS,** the parties wish to set forth in this Agreement their respective obligations and responsibilities;

**NOW, THEREFORE**, in consideration of the foregoing and the mutual promises contained herein, and subject to the terms and conditions set forth below, Client and CitiStreet hereby agree as follows:

## A G R E E M E N T

### ARTICLE 1
### BUSINESS REQUIREMENTS DOCUMENT

The parties have reached agreement on the Services to be rendered by CitiStreet. The Services to be rendered and the assumptions underlying the Services to be rendered are set forth in the BRD, which is attached hereto as Exhibit A, and the direct expenses applicable to such Services are specified in Exhibit B. Based upon the assumptions contained therein, CitiStreet agrees to supply the Services on the conditions contained in the BRD. CitiStreet shall perform the Services hereunder in accordance with the Performance Standards attached as Exhibit C.

### ARTICLE 2
### PARTICIPANT DATA

2.1     **Provision of Participant Data**. Prior to the commencement of the Services and throughout the term of this Agreement, Client shall furnish or cause to be furnished to CitiStreet all client information ("Client Information") and participant data ("Participant Data"), as hereinafter defined, necessary for CitiStreet to provide the Services. Participant Data shall mean the records and information (whether in hard copy or electronic form) pertaining to Participants

and their benefits under the Plans and supplied by Client or Participants or created by CitiStreet or its subcontractors in the course of providing the Services. Client Information shall mean any and all data or information (in whatever form or media) that is owned or developed by or licensed to Client and that is supplied to CitiStreet by Client. All such Client Information and Participant Data shall be provided in a timely manner and in formats agreed upon by Client and CitiStreet and shall be complete in all material respects. CitiStreet's obligation to provide the Services in accordance with the BRD and other deadlines under this Agreement is contingent upon the timely receipt of Participant Data from Client that is complete and conforms to the formats and specifications agreed to by Client and CitiStreet. Client shall be solely responsible for the accuracy and completeness of any such Client Information and Participant Data and shall promptly furnish or cause to be furnished accurate and complete Client Information and Participant Data to correct any inaccuracies or incompleteness with respect to Client Information and Participant Data previously provided to CitiStreet, except to the extent such participant data is created by CitiStreet.

2.2 **Client's Review of Participant Data**. Client shall review processed Participant Data and verify any such Participant Data or reports relating to the Participant Data promptly after receipt thereof and shall promptly notify CitiStreet in writing of any claimed error with respect to any Participant Data or report. Any such data or report not challenged in writing by Client within thirty (30) days of receipt thereof shall be conclusively presumed accurate and complete.

## ARTICLE 3
## CITISTREET'S SERVICES

3.1 **General**. CitiStreet shall provide the Services specified in the BRD as may be amended from time to time. The BRD may contain terms modifying or supplementing the provisions of this Agreement. CitiStreet shall have no obligation to provide any Services pursuant to the BRD until CitiStreet and Client have accepted such Services in writing. The parties may, from time to time, amend, supplement, or replace the BRD, or any portion thereof, as provided in Article 8. CitiStreet represents that (i) its Services shall conform in all material respects with the BRD; (ii) it will use due care in providing the Services and (iii) it will use its best efforts to maintain the CitiStreet System, which shall mean the equipment, computer software, interactive voice response systems, other technological systems and related documentation used by CitiStreet to provide the Services, so that the Services are furnished in a manner which complies with all applicable federal laws and regulations as are in effect from time to time. The Services shall conform to prevailing industry standards for comparable Services.

3.2 **Disclaimer**. EXCEPT AS EXPRESSLY STATED IN THIS ARTICLE, THERE ARE NO WARRANTIES, EXPRESS OR IMPLIED, WITH RESPECT TO THE GOODS OR SERVICES TO BE PROVIDED UNDER THIS AGREEMENT. CITISTREET EXPRESSLY DISCLAIMS ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

3.3    **Remedies**. CitiStreet's responsibility to use due care in providing the Services is limited to correcting errors, within a reasonable time, which result from malfunction of the CitiStreet System, error by its staff, or are otherwise caused by the negligent acts of its officers, employees and agents. CitiStreet shall make a good faith effort to correct any error caused by its performance as soon as reasonably practicable after identification of the error when such correction is reasonably necessary and practical under the circumstances; provided that Client notifies CitiStreet as soon as reasonably practicable after identification of the error, but no later than ninety (90) days after Client learns or should have learned that the Services in question were not performed in accordance with Section 2.1.

3.4    **Correction of Client's Errors**. CitiStreet will attempt to correct, at Client's expense, processing errors resulting from Client's error, error by Client's staff, or otherwise caused by the negligent acts of Client's officers, employees and agents or other Plan service providers to the extent reasonably possible; provided that Client promptly notifies CitiStreet of such error and furnishes all data to CitiStreet reasonably necessary to make such changes.

## ARTICLE 4
## DIRECT EXPENSES

4.1    **General**. As consideration for CitiStreet's performance of the Services, Client agrees to pay CitiStreet the expenses set forth in Exhibit B.

4.2    **Additional Services**. If CitiStreet provides services in addition to the Services set forth in the BRD, CitiStreet shall be entitled to reimbursable expenses as the parties mutually agree.

4.3    **Taxes**. Client shall pay or reimburse CitiStreet for all sales, use, customs, excise, gross receipts, or similar taxes levied or based upon the Services provided by CitiStreet hereunder (including any taxes that may arise from CitiStreet's delivery of any software, data, or documentation hereunder), provided that Client shall not be liable for any taxes based on CitiStreet's net income. CitiStreet shall be responsible for collecting and remitting any taxes to the appropriate taxing authorities.

4.4    **Invoicing and Payment**. CitiStreet shall provide Client with an invoice for expenses related to Services performed. Client shall pay, or shall direct the trustee of the Plan to pay, CitiStreet's invoices by the first day of the second month following receipt of invoice.

4.5    **Outside Fund Compensation**. CitiStreet has entered into contracts with certain investment funds and fund service providers (the "Funds") pursuant to which such Funds compensate CitiStreet for administrative and sub-transfer agency functions calculated with reference to the aggregate assets of CitiStreet clients' plans under management by such Funds and/or on a per participant basis investing in the Funds. Any amounts paid by the Funds shall be paid directly to CitiStreet and shall be used to directly offset the expenses to be charged to the Plans as listed on Exhibit B.

4.6    **CitiStreet Change of Control**.    In the event that, during the term of this Agreement, CitiStreet and Client become unaffiliated companies, the expenses set forth in Exhibit B and the performance standards set forth in Exhibit C shall be renegotiated to reflect then current industry standard fees and penalties as the parties shall mutually agree.

## ARTICLE 5
## TERM AND TERMINATION

5.1    **Initial Term; Renewal**.    Upon execution by both parties, this Agreement shall commence on the effective date stated above and shall remain in effect for a period of five (5) years after CitiStreet commences providing ongoing Services.    After five (5) years this Agreement shall automatically continue in effect for successive one year periods until the parties shall have agreed to terminate this Agreement in accordance with this Article 5.

5.2    **Termination for Default**. This Agreement may be terminated for Default by either party as provided in Section 9.7 hereof

5.3    **Termination Without Cause**.    Either party may terminate this Agreement at any time without cause by giving at least one hundred eighty (180) days prior written notice of such termination to the other party.

5.4    **Obligations upon Termination**.    Upon any termination or non-renewal of this Agreement, CitiStreet shall deliver to Client, at the terminating party's expense, the Client Information, Participant Data and inventory ("Inventory").    Inventory shall mean paper stock, check stock and other materials purchased by CitiStreet or its subcontractors in connection with performing the Services and which is chargeable to Client. Any termination of this Agreement shall terminate all Services being provided hereunder on the effective date of the termination.

5.5    **Cooperation with Transfer**. In the event of any termination or non-renewal of this Agreement, CitiStreet shall cooperate with Client in the transfer of CitiStreet's obligations hereunder to a replacement service provider.

5.6    **Miscellaneous**.    Notwithstanding any provisions of this Agreement to the contrary, the provisions of Article 11 shall survive the termination of this Agreement as provided in this Article 5.

## ARTICLE 6
## AMENDMENTS

6.1    **Amendments**. The parties may amend any aspect of this Agreement by mutual agreement, including changes related to (i) the deletion of Services, (ii) the addition of Services, (iii) the modification of Services, or (iv) any other changes that alter the scope of this Agreement. Any such changes shall be made pursuant to a written amendment to this Agreement executed by both parties.

## ARTICLE 7
## PLAN AMENDMENTS

7.1    **CitiStreet's Review of Plan Amendments**.  CitiStreet shall be under no obligation to process any Plans' amendments proposed by Client until it has been given ninety (90) days to review such amendments.  If a Plan Amendment affects the Agreement, including the BRD, CitiStreet and Client shall comply with the amendment procedures set forth in Article 6.

7.2    **Effect of Plan Amendments**.  Processing of Plan amendments by CitiStreet shall constitute CitiStreet's acquiescence to the use of the documents involved and not its approval of their contents or their effect.  Client shall assume full responsibility to CitiStreet and to all interested persons for such contents and such effect.

7.3    **Client's Responsibility for Plan Amendments**.  Client shall be responsible for preparation and submission of any Plans and Plan amendments for Internal Revenue Service determination.  Client shall take all measures required under current federal law and applicable provisions of the Internal Revenue Code and related regulations to assure the qualification of any Plans.  CitiStreet shall be under no duty to question the measures taken by Client pursuant to Section 7.2 hereof and this Section 7.3.

## ARTICLE 8
## CLIENT DIRECTIONS

8.1    **General**.  In the course of providing the Services, CitiStreet may receive written or oral instructions or directions from participants, representatives of Client or its legal counsel (hereinafter collectively referred to as "Client Directions") concerning provision of the Services. Client Directions may include, but shall not be limited to, (i) approval of CitiStreet's choice of methodology or approach to providing the Services; (ii) interpretation of any provision of the Plans; (iii) instructions concerning compliance with applicable laws and regulations; (iv) instructions concerning compliance with subpoenas or other legal process; and (v) notices concerning adjudication of Participants' claims for benefits.  Upon receipt of Client Directions, CitiStreet shall promptly indicate acceptance of Client Directions or notify Client in writing that it will not be able to comply with such Client Directions and provide a description of the reasons therefor.  CitiStreet may, but shall not be required to, inquire into the genuineness of any Client Direction or require written confirmation thereof.  The BRD shall be deemed to be a standing Client Direction.

8.2    **Reliance**.  CitiStreet may rely upon and comply with any Client Direction in performing its obligations under this Agreement. If and to the extent that CitiStreet or any of its subcontractors act or fail to act as a result of reasonable reliance upon any Client Direction or any information, data, document or instrument supplied by Client or a Participant, CitiStreet shall be relieved of any liability arising therefrom and such act or failure to act shall not constitute a Default, breach or nonperformance of any warranty or obligation of CitiStreet contained in this Agreement. Provided however that, CitiStreet shall not be relieved of any liability arising out of or resulting from dishonest, fraudulent, or criminal acts of CitiStreet's employees, acting alone or in collusion with others.  If CitiStreet requests instruction or direction from Client and does not receive a Client Direction in a timely manner, CitiStreet shall be deemed not to have breached this Agreement with respect to any act or failure to act undertaken in good faith relating to the instructions requested.

8.3    **Conflict with Agreement**.  If any Client Direction is inconsistent with or conflicts with any provision of this Agreement or the BRD, CitiStreet may, at its discretion, require that such Client Direction be confirmed in an amendment.

8.4    **Security Codes**.  If CitiStreet has issued to Client, or to any agent appointed by Client, security codes or passwords in order that CitiStreet may verify that certain transmissions of information, including directions or instructions, have been originated by Client or its agent, as the case may be, CitiStreet shall be indemnified by and be without liability for any action taken or omitted by it in reliance upon receipt by CitiStreet of transmissions of information with the proper security code or password, including communication purporting to be directions or instructions, which CitiStreet reasonably believes to be from Client or its agents.

## ARTICLE 9
## DEFAULT AND REMEDIES

9.1    **Default by CitiStreet**.  As applied to CitiStreet, "Default" shall mean any material breach or nonperformance of a material obligation of CitiStreet under this Agreement that is not cured or excused in accordance with the provisions of this Article or which has been agreed to in writing by the Parties.

9.2    **Default by Client**.  As applied to Client, the term "Default" shall mean any material breach or nonperformance of a material obligation of Client including payment under this Agreement that is not cured or excused in accordance with the provisions of this Article.

9.3    **Notice of Default**.  A Default shall not be deemed to have occurred unless the nondefaulting party has given written notice (a "Default Notice") to the defaulting party in accordance with the requirements of this Section. A Default Notice shall specify in reasonable detail the events which the nondefaulting party believes have occurred and which constitute or evidence a Default, the provisions of this Agreement (including any applicable provisions of Exhibit A)  which have not been performed or complied with, and the actions which, in the opinion of the nondefaulting party, would be required to fulfill the requirements of this

Agreement and cure the Default. An immaterial failure to comply precisely with the foregoing notice requirements shall not affect the validity of a Default Notice if the defaulting party was not prejudiced by such failure.

9.4    **Cure Period**. Following the giving of a Default Notice, the defaulting party shall have sixty (60) days (the "Cure Period") in which to take the necessary actions to cure its breach or nonperformance. All Cure Periods shall commence on the date a Default Notice is received. There is no Cure Period for any failure by Client to pay charges that become due under this Agreement when due.

9.5    **Extension of Cure Period**.  Any Cure Period provided for in the preceding paragraph shall be extended for up to one hundred twenty (120) days (or for such longer period as the parties may agree in writing) if (i) the nonperforming party is making its best efforts to promptly cure the nonperformance, (ii) a cure cannot practically be achieved within the applicable Cure Period, and (iii) within the first 60 days of the initial Cure Period provided for in Section 9.4 hereof, the defaulting party gives the non-defaulting party written notice of defaulting party's need for an extension and of the actions it is taking to cure its breach or nonperformance and the number of days which it will require to cure its breach or nonperformance.  As used in the preceding sentence, the term, "best efforts" shall mean the application of diligence and resources reasonably necessary to cure the nonperformance in a business like fashion with due regard for the seriousness of the nonperformance and its impact upon the other party and those to whom the other party may have legal or contractual obligations.

9.6    **Excuse**.  A party's failure to perform any of its obligations under this Agreement shall be excused if and to the extent such failure arises out of causes beyond the reasonable control of the nonperforming party. Such causes may include, but are not restricted to, (i) acts of God or the public enemy, acts of the government in either its sovereign or contractual capacity, fires or other loss of facilities, floods, epidemics, quarantine restrictions, strikes, freight embargoes, failure of a common carrier, delays or failures of access involving the Internet, World Wide Web or similar services including network traffic and configuration problems therewith, unusually severe weather, or labor disputes; or (ii) the acts or omissions of the other party, including in the case of CitiStreet, its reliance upon Client Directions or information, data documents or instruments provided by Client or any Participant, provided, however, that in every such case the failure to perform must be beyond the reasonable control of the nonperforming party.

9.7    **Termination for Default**. Upon (i) the occurrence of a Default which is not excused pursuant to Section 9.6 of this Article, (ii) the delivery of a Default Notice to the defaulting party as provided in Section 9.3 of this Article, and (iii) the defaulting party's failure to cure the Default prior to the expiration of the applicable Cure Period specified in Section 9.4 of this Article (as such period may be extended pursuant to Section 9.5 of this Article), the nondefaulting party shall have the right to terminate this Agreement by delivering not less than 30 days' prior written notice of termination ("Termination Notice") to the defaulting party.

### ARTICLE 10
### LIABILITY

10.1   **Insurance**. CitiStreet shall at all times during the term of this Agreement, at its own cost and expense, carry and maintain commercially reasonable insurance coverage.   Upon Client's request, CitiStreet shall provide evidence of such coverage.

10.2   **Disclaimer of Consequential Damages**.   NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY FOR ANY INDIRECT, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES, REGARDLESS OF THE FORM OF ACTION, WHICH MAY ARISE FROM THE PERFORMANCE, NONPERFORMANCE, BREACH OF WARRANTY, DEFAULT OR OTHER BREACH OF THIS AGREEMENT. Notwithstanding the foregoing, the limitation of liability for damages in this Section 10.2 shall not apply to the indemnity obligations of the parties in Sections 11.1 and 11.2 to the extent that such indemnity obligations arise from (i) a final judgment of any court awarding indirect, special, consequential or punitive damages, or (ii) any settlement agreement that includes such damages and that is entered into with the prior written agreement of the indemnifying party.

10.3   **Damages**. CitiStreet's aggregate liability for any and all claims, whether based on performance, nonperformance, breach of contract or warranty, events of Default, tort, strict liability or otherwise, shall be limited to direct damages attributable hereunder to the conduct of CitiStreet. If Client properly terminates this Agreement for CitiStreet's Default as provided in Article 9, Client's direct damages under this Section may include the out-of-pocket costs incurred in securing a replacement contractor, or transferring the functions back to Client, including all implementation expenses payable to a third party and other expenses incurred by Client, but such damages shall not include any ongoing costs of providing such replacement Services. Neither party shall be liable to the other for damages of any type (other than late payment charges) with respect to any nonperformance, breach or Default which is cured during the applicable Cure Period.

10.4   **Maximum Liability**. CitiStreet's aggregate liability, including any liability of its officers, directors, employees, agents and subcontractors, for any and all claims, whether brought by Client, the Plans, any Participant or other third party or any person or entity whatsoever and whether based on performance, nonperformance, breach of contract or warranty, events of Default, tort, strict liability or otherwise, shall not in any event during any calendar year exceed the fees paid by Client to CitiStreet during such calendar year, except actions arising from CitiStreet negligence.

### ARTICLE 11
### INDEMNIFICATION

11.1   **Client's Indemnity of CitiStreet**. Client shall be responsible for any and all liability, claims, damages, costs and expenses (including without limitation court costs and reasonable attorneys' fees) (collectively, "Losses"), and shall defend, indemnify, and hold CitiStreet harmless from and against any and all third-party actions, suits, proceedings, claims or liability, arising from the performance or nonperformance of this Agreement, including but not

8

limited to (i) Client's negligence or willful misconduct, (ii) CitiStreet's performance of its obligations and provision of the Services pursuant to this Agreement, or any Client Direction, and (iii) any act or omission of Client, any Plan or any fiduciary, trustee, plan committee or any other service provider to a Plan, except to the extent that any such Loss arises out of or results from CitiStreet's negligence, bad faith or error in performing or not performing this Agreement.

11.2    **CitiStreet's Indemnity of Client**. CitiStreet shall be responsible to the Client for any and all liability, claims, damages, costs and expenses (including without limitation court costs and reasonable attorneys' fees) (collectively, "Losses"), and shall defend, indemnify, and hold Client harmless from and against any and all third-party actions, suits, proceedings, claims or liability, arising from CitiStreet's negligence or willful misconduct in the performance or non-performance of this Agreement.

11.3    **Apportionment of Liability**. In any matter that is described in both Sections 11.1 and 11.2, liability shall be apportioned between Client and CitiStreet in proportion to the extent to which each is responsible for causing the matter to arise.

11.4    **Compliance with Client Directions.** Notwithstanding anything to the contrary contained in Sections 11.1 to 11.3 above, Client agrees that it shall be responsible for any and all Losses arising from CitiStreet's performance (or nonperformance) in accordance with this Agreement or any Client Direction, unless such losses are due to CitiStreet's negligent or willful misconduct.

11.5    **Client's Liability for Plan Obligations**. Client or the Plans shall remain solely liable for all obligations and benefits payable under the terms of the Plans and applicable law. CitiStreet shall be liable for an obligation or benefit which a Plan shall be required to pay solely as a result of CitiStreet's negligence, bad faith or willful misconduct in performing or not performing its obligations under this Agreement which benefit or obligation is in addition to that which would otherwise be payable under the terms of the Plans and applicable law.

11.6    **Participation in Defense**. A party may participate at its expense in the defense of any action or claim which may be asserted against it and for which such party seeks indemnity pursuant to the provisions of this Article, or such indemnified party may assume the defense of such claim or action, including the right to settle or compromise any claim against it without the consent of the indemnifying party, provided that in doing so it shall be deemed to have waived its right to indemnification except in cases where the indemnifying party has declined to defend the claim. The indemnifying party may settle an action, suit or proceeded without the indemnified party's consent only if such settlement includes a general release of the indemnified party.

11.7    **Indemnified Persons**. In this Article, references to Client and CitiStreet shall be deemed to include their respective partners, members, directors, officers, agents, employees, attorneys, affiliates and subcontractors.

## ARTICLE 12
### CONFIDENTIAL INFORMATION

12.1  **Confidential Information**.  "Confidential Information" shall include all confidential or proprietary information disclosed by one party (the "Discloser") to the other (the "Recipient") during the term of this Agreement and shall include, without limitation, the provisions of this Agreement and its Exhibits.  Confidential Information shall not, however, include the following: (i) information which is now or hereafter comes into the public domain; (ii) is of a type normally or commonly included in communications to employees about retirement plans, (iii) is in the possession of a party to this Agreement on the effective date hereof, and if it shall not have been obtained from the other party, (iv) shall be developed by a party outside the scope of any agreement with the other party, or (v) shall be obtained rightfully from third parties.

12.2  **Confidential Treatment**.  The Recipient shall treat the Confidential Information as confidential, using the same standard of care that it uses to protect its own proprietary or confidential information (but not less than a reasonable standard of care), and no information shall be disclosed to third parties by the Recipient, its officers, employees, consultants, or agents without the prior written consent of the Discloser.  Each party agrees to take all reasonable precautions to prevent the disclosure to third parties of such information, except as may be necessary by reason of legal, accounting or regulatory requirements, as the case may be.

12.3  **Return of Information**. All Confidential Information shall remain the property of the Discloser.  Upon the Discloser's request, the Recipient shall promptly return the Confidential Information; provided, however, that the Recipient may retain copies subject to these confidentiality obligations solely for archival purposes.

12.4  **Requirements of Law**.  Recipient shall not be bound under this Article to the extent that it acts under compulsion of law or in accordance with the requirements or any national or local government or government instrumentality or any other body with whose requirements the parties may be required by law or practice to conform.  If Recipient is required to disclose Confidential Information pursuant to such requirements of law, Recipient shall first notify the Discloser so that it may seek protective orders or take any other legal action it deems necessary. Any Confidential Information disclosed pursuant to requirements of law shall still be deemed confidential.

12.5  **Right to Equitable Relief**.  Recipient acknowledges and agrees that a breach of these confidentiality obligations would cause irreparable harm to Discloser and that no adequate remedy is available at law for such breach.  Accordingly, it is agreed that the recipient will be entitled to an injunction or injunctions to prevent breaches of these confidentiality obligations and to enforce specifically the terms and provisions of this Article 12.

## ARTICLE 13
## RIGHTS IN DELIVERABLES AND DATA

13.1  **Deliverables**.  Client shall have the right, subject to the limitations set forth in this Agreement, to reproduce, use and dispose of all or any part of the reports, or records, documents, data and other materials to be delivered to Client pursuant to this Agreement in administering the Plans.

13.2  **Intellectual Property**.  Nothing contained in this Agreement shall confer to Client any property rights, proprietary interest, copyright or license in the assets or technology of CitiStreet, including, without limitation, the software, upgrades and enhancements to the software, written materials, screen formats and designs, techniques, interactive design techniques, report formats, interactive design formats, systems or know how used or developed to provide the Services.  Client acknowledges that such assets and technology constitute copyrighted trade secrets or proprietary information of substantial value to CitiStreet.  Client agrees that it shall treat the foregoing assets and technology as proprietary to CitiStreet and that it shall not divulge any of such proprietary information to any person or organization except as expressly permitted hereunder.  Without limiting the foregoing, Client agrees for itself and its employees and agents:

(a)       to use such programs and data bases solely on CitiStreet's computers, and solely in accordance with CitiStreet's applicable user documentation;

(b)       to refrain from copying or duplicating in any way (other than in the normal course of performing processing on CitiStreet's computers) any part of the CitiStreet System;

(c)       to refrain from obtaining unauthorized access to any programs, data or other information not owned by Client, and if such access is accidentally obtained, to respect and safeguard the same as confidential information of CitiStreet.

(d)       to refrain from causing or allowing information transmitted from CitiStreet's computer to Client's terminals to be retransmitted to another computer, terminal or other device;

(e)       that Client shall have read only access to only those authorized transactions as agreed to between Client and CitiStreet;

(f)       to honor reasonable written requests made by CitiStreet to protect at CitiStreet's expense the rights of CitiStreet in the CitiStreet System and other proprietary information at common law, under the federal copyright statutes and under other federal and state statutes; and

(g)       to use the equipment, computer programs and other information supplied by CitiStreet under this Agreement solely for its own internal use and benefit in administering the Plans and not for resale or other transfer or disposition to, or use by or for the benefit of, any other person or organization without prior written approval of CitiStreet.

11

Notwithstanding the preceding, it is the intent of the parties that each party to this agreement shall retain all property rights as previously agreed to in the Joint Venture Participation Agreement dated December 7, 1999 forming CitiStreet.

      13.3   **Participant Data and Client Material**.  All of the Participant Data, Client Information and any other materials pertaining to Client's requirements or the Plans and provided to CitiStreet by Client pursuant to this Agreement shall at all times remain the property of Client.

      13.4   **Inspection**.  During the term of this Agreement and for twelve (12) months following the termination of this Agreement, Client or its auditor may, not more than once in each twelve (12) month period, inspect data and materials used to provide the Services. CitiStreet may require the execution of additional confidentiality agreements in connection with any such inspection.  Any inspection and audit shall take place during CitiStreet's regular business hours upon reasonable notice to CitiStreet.  The charges under this Agreement do not include CitiStreet's fees and expenses for Client's inspection of data and materials; CitiStreet shall invoice Client separately for its standard hourly fees and expenses for time spent in excess of twenty (20) hours per year in supporting Client's audit and inspection, unless such audit and inspection reveals material deficiencies or financial errors in CitiStreet's performance of services under this agreement, in which case any additional hours required to conduct the audit or inspection shall be at CitiStreet's expense.

      13.5   **Production of Documents**.  The charges under this Agreement do not include CitiStreet's fees and expenses for any costs, including legal costs, associated with considering or responding to requests for documents, providing testimony, or participating in legal or regulatory proceedings as a result of the performance of the Services.  CitiStreet shall invoice Client separately for such fees and expenses.

      13.6   **Compliance Audit**.  Notwithstanding any provisions in Section 13.4, Inspection, Client shall have the right, from time to time, to conduct a compliance audit of CitiStreet's processing of the Client's plans.  Such compliance audit may be conducted by Client's counsel, its internal auditing department or by an independent auditor of the Client's choice.  This compliance audit may be made upon reasonable notice from Client to CitiStreet.  Client shall be responsible for payment of any fees charged by the independent auditor for the compliance audit to the extent not paid with assets of the Plans.

## ARTICLE 14
## COMPLIANCE WITH LAW

14.1    **Compliance**. CitiStreet shall use reasonable efforts to notify Client if CitiStreet's Project Manager (as hereinafter defined) learns that the Services do not comply with any applicable laws, rules, regulations or ordinance relating to the Services, including but not limited to provisions of ERISA or the Code, provided, however, that this Agreement shall not create any duty or liability on the part of CitiStreet to seek out or discover such non-compliance, to advise or consult with Client concerning such matters, or to ensure compliance by the Plans or Client with any of the foregoing except as set forth in Section 14.2 below.

14.2    **Changes**. To the extent that any change in applicable laws, rules, regulations or ordinances relating to the Services would make a change to the BRD necessary or desirable, CitiStreet shall notify Client thereof if and to the extent CitiStreet's Project Manager becomes aware of such matter. Any such changes shall be made upon Client's request or approval, subject to the provisions of Article 6 hereof.

14.3    **Filing of Tax Returns**. Although CitiStreet may provide data used in such returns, forms or information, CitiStreet shall not be responsible for the filing of any federal, state or local tax return, forms or information on behalf of Client or any Plan unless specifically described in the BRD.

## ARTICLE 15
## SUBCONTRACTING AND ASSIGNMENT

15.1    **Subcontracting**. CitiStreet may enter into one or more subcontracts in connection with the performance of this Agreement. CitiStreet shall give Client prior written notice of the identity of any material subcontractor providing Services under this Agreement. CitiStreet shall remain responsible for the performance of any subcontractor.

15.2    **Assignment**. Neither party may assign any of its rights under this Agreement without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed. Subject to the foregoing, all of the terms and provisions of this Agreement shall be binding upon and inure to the benefit of and be enforceable by the successors and permitted assigns of Client and CitiStreet.

## ARTICLE 16
## PROJECT MANAGEMENT

16.1    **Project Manager**. Each party shall designate an appropriate person as the contact person for all operational issues associated with the performance of this Agreement (in the case of each party, a "Project Manager"). Each party shall make its Project Manager available for planning sessions, status meetings, and telephone consultation or otherwise as reasonably

required to facilitate the implementation of this Agreement. If appropriate, the parties may designate assistant project managers. Each party's Project Manager shall have authority to issue, execute, grant or provide any approvals, requests, notices or other communications required hereunder or requested by the other party hereto.

16.2 **Project Meetings and Reports**. The parties shall hold such meetings to manage the Services as they may agree and CitiStreet shall provide Client with such reports as are required.

## ARTICLE 17
## SUSPENSION OF SERVICES

17.1 **General**. CitiStreet reserves the right to suspend all Services for a period not to exceed 12 hours per suspension to conduct routine servicing and maintenance of the facilities of CitiStreet and/or its subcontractors. This period of time may be extended with Client's advance notice and agreement. CitiStreet will endeavor to suspend operations only during weekends to the extent reasonably practicable so as to minimize service interruption. CitiStreet shall notify Client no less than 30 days prior to any such planned suspension of the Services.

## ARTICLE 18
## NOTICES

18.1 **General**. All notices, requests, demands and other communications required to be given hereunder shall be in writing and shall be deemed to have been duly given the day of delivery by hand or telephonic facsimile (and duly receipted), or the day after sending by recognized overnight courier service or five (5) days after mailing, certified or registered mail, return receipt requested to the party for whom intended at the address specified in this Article. Either party may designate an alternate address for notices by giving written notice thereof in accordance with the provisions of this Article.

18.2 **Notices to CitiStreet**. All notices to CitiStreet shall be directed as follows:

CitiStreet LLC
Batterymarch Park III
Three Pine Hill Drive
Quincy, MA 02169
Attn: Paul Parsons
Telephone: (617) 376-7303
Facsimile: (617) 376-1721

With a copy to:

General Counsel
CitiStreet LLC

Batterymarch Park III
Three Pine Hill Drive
Quincy, MA 02169

18.3 **Notices to Client**. All notices to Client shall be directed as follows:

Client :

Citigroup Inc.
Corporate Benefits
1 Court Square
15th Floor
Long Island City, NY 11120
Attention: Kathleen Lehane
Telephone: (718) 248-4224
Fax: (718) 248-5090

with a copy to:

Citigroup Inc.
ERISA/Benefits Counsel
399 Park Avenue
16th Floor, Zone 9
New York, NY 10043

or to such other addresses as the parties may agree to in writing.

<div align="center">

**ARTICLE 19**
**REPRESENTATIONS**

</div>

19.1 **CitiStreet's Corporate Authority and Due Execution**. CitiStreet represents that (i) it has the power and authority to execute, deliver and perform this Agreement and that the execution, delivery and performance of this Agreement by CitiStreet have been duly authorized by all necessary action of its members, and (ii) this Agreement has been duly executed and delivered by CitiStreet and constitutes the legal, valid and binding obligation of CitiStreet enforceable against CitiStreet in accordance with its terms.

19.2 **Client's Corporate Authority and Due Execution**. Client represents that it has the corporate power and authority to execute, deliver and perform this Agreement and that the execution, delivery and performance of this Agreement by Client have been duly authorized by all necessary corporate action, and (ii) that this Agreement has been duly executed and delivered by Client and constitutes the legal, valid and binding obligation of Client enforceable against Client in accordance with its terms. Client also represents that it has obtained all approvals of the

<div align="center">15</div>

Plan Committee, named fiduciaries or other parties that may be required pursuant to the provisions of the Plans.

## ARTICLE 20
## RELATIONSHIP OF THE PARTIES

20.1    **General**.  None of the provisions of this Agreement shall be construed to create an agency, partnership or joint venture relationship between the parties or the partners, officers, members or employees of the other party by virtue of either this Agreement or actions taken pursuant to this Agreement.

20.2    **Fiduciary Status**.  Client and CitiStreet understand and intend that CitiStreet shall not be a fiduciary within the meaning of ERISA or any state law with respect to any Plan. CitiStreet shall not have any discretion with respect to the management or administration of any Plan or with respect to determining or changing the rules or policies pertaining to eligibility or entitlement of any Participant in any Plan to benefits under such Plans. CitiStreet also shall not have any control or authority with respect to any assets of any Plan, including the investment or disposition thereof.   The Client acknowledges that the Plan's fiduciary is responsible for the selection of service providers and investment funds and that it is a fiduciary, within the meaning of ERISA, with respect to the Plan. All discretion and control with respect to the terms, administration or assets of any Plan shall remain with Client or with the named fiduciaries under such Plan.

## ARTICLE 21
## GENERAL PROVISIONS

21.1    **No Waiver**.  A party's failure at any time to enforce any of the provisions of this Agreement or any right with respect thereto shall not be construed to be a waiver of such provision or right, nor to affect the validity of this Agreement. The exercise or non-exercise by a party of any right under the terms or covenants herein shall not preclude or prejudice the exercising thereafter of the same or other rights under this Agreement.

21.2    **Severability**.  The terms and provisions of this Agreement shall be severable. If any term or provision is held to be invalid or unenforceable, that term or provision shall be ineffective to the extent of such invalidity or unenforceability.   The remaining terms and provisions shall continue in full force and effect.

21.3    **Entire Agreement**.   Subject to the terms and conditions hereof: (i) this Agreement together with its exhibits, schedules, and attachments contains the entire understanding of the parties with respect to the provision of the Services; (ii) there are no expectations, restrictions, promises, warranties, covenants, or undertakings other than those expressly set forth herein; (iii) this Agreement supersedes all prior agreements and understandings between the parties with respect to the Services; and (iv) this Agreement, unless

otherwise specified herein, may be amended only by a written instrument duly executed by the parties hereto or their respective successor or assigns.

21.4    **No Third Party Beneficiaries**.  This Agreement is for the benefit of the parties and their permitted assigns. It is not intended to create a benefit to any third parties.

21.5    **Governing Law**.  This Agreement shall be governed by and interpreted and enforced in accordance with the laws of the Commonwealth of Massachusetts, without regard to the conflict of laws provisions thereof, except that when Federal law exists on substantive matters requiring construction under this Agreement, such Federal law shall apply in lieu of State law but only to the extent required by applicable federal laws, including without limitation ERISA.

21.6    **Survival of Obligations**.    The parties' respective obligations under this Agreement which by their nature would continue beyond the termination or expiration of this Agreement, including, without limitation those contained in the Articles entitled Compensation, Confidential Information, and Indemnification, and Dispute Resolution shall survive the termination or expiration of this Agreement.

21.7    **Termination for Insolvency**.  Notwithstanding anything herein to the contrary, either party may terminate this Agreement immediately if the other party files a petition in bankruptcy or proceedings in bankruptcy are instituted against it and not dismissed within 90 days, or any court shall assume jurisdiction of such party and its assets pursuant to proceedings under any bankruptcy or reorganization act, or a receiver is appointed to such party's assets and is not dismissed within ninety 90 days, or if such party shall make an assignment for the benefit of creditors.

21.8    **Headings and Captions**.  All headings and captions contained in this Agreement are for convenience of reference only and shall not affect in any way the interpretation or meaning of this Agreement.

21.9    **Pronouns**.  Words used herein, regardless of the number and gender specifically used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine, or neuter, as the context requires.

**IN WITNESS WHEREOF,** the parties hereto have duly executed this Agreement effective as of the date first above written.

**CITISTREET LLC**

By _____

Title: Nicholas S. Katsikis, Chief Financial Officer

**CITIGROUP INC**

By: _____

Title: _____

KIM M. Fr...
V.P. Director, Corpora...s
Citigroup Corporate Human ...sources
One Court Square, 15/2
Long Island City, NY 11120
Tel: (718) 248-8058/Fax: (71... ...9-5090

**EXHIBIT A**

**<u>BRD</u>**

**EXHIBIT B**

**EXPENSES**

Recordkeeping Services, including:
- Daily Valuation – processing of enrollments, transfers, withdrawals, loans and hardships
- CitiStreet Participant Service Representatives available 8:00 AM – 8:00 PM EST
- Voice Response Unit – available 24 hours per day/ 7 days per week with minimal downtime for maintenance
- Internet Access to Participant Accounts Weekly Contribution Processing/EDI Transmissions
- Quarterly Participant Statements
- Transactional Confirmation Statements/Package Fulfillment mailed daily
- Paperless General Loans
- Residential Loans
- Reconcilement
- Hardship Approval
- Manual Loan Repayment/Payoff Processing
- QDRO Processing
- Daily Transmissions
- Annual Company Match Calculation
- Discrimination Testing
- Required Minimum Distribution Processing
- Accepting and processing rollovers to and from other qualified plans

**Direct Expenses of CitiStreet to be charged to the Plans include:**

-Dedicated Plan Administration Team
-Implementation with Internet for the Plans (amortized over 4 years)*
-Termination Fee of $448,000 payable to prior service providers (amortized over 4 years)* (Actual termination fees are $648,000, with $200,000 paid by CitiStreet)
- Dedicated Participant Service Team within Call Center
- Dedicated Systems Resources

**Out-of-Pocket Expenses**

**Including but not limited to:**

- Employee Communications mailing and printing costs, if applicable
- Toll-free access (AT&T Usage)
- Postage

Proxy Tabulation
Express mail

The initial estimates for the above expenses equal $40 per participant per year. The $40 charge does not take into account any 12-b-1 fees. If the $40 per participant charge is offset using the 12b-1 fees, initial estimates will reduce the accrued per participant charge to an estimated $27 per year. These initial expense estimates will be accrued against the trust.

No less frequently than semi-annually, the actual expenses incurred for the expenses listed above will be compared to the accrued estimates. Any differences will be charged (if the actual expenses are greater) or credited (if the actual expenses are less) at such time. In addition, the future expense accrual will be adjusted to reflect the actual expenses. No less frequently than annually, the direct expenses charged to the Plans will be audited by an independent third party chosen by CitiStreet and the Client.

- In the event that this Agreement is terminated prior to July 1, 2005, the Client shall pay to CitiStreet any unamortized implementation expenses and termination fees. The amount of implementation expenses and termination fees are $1,768,165.00. The amount shall be payable as follows upon termination: (i) 100% for termination prior to July 1, 2002; (ii) 75 % for termination between July 1, 2002 and June 30, 2003; (iii) 50% for termination between July 1, 2003 and June 30, 2004; (iv) 25% for termination between July 1, 2004 and June 30, 2005; and (v) 0% for termination after July 1, 2005  Notwithstanding the foregoing, Client shall not be liable for any termination expenses in the event of CitiStreet's termination without cause, as described in Section 5.3 herein or in the event of CitiStreet's termination for default, as described in Section 9.7 herein.

In the event that, during the term of this Agreement, CitiStreet and Client become unaffiliated companies, the expenses set forth in this Exhibit B shall be renegotiated to reflect then current industry standard fees and penalties as the parties shall mutually agree.

**CITISTREET LLC**

By _____
Title: Nicholas S. Katsikis, Chief Financial Officer

**CITIGROUP INC.**

By: _____
Title: _____

KIM M. PASCALE
V.P. Director, Corporate Benefits
Citigroup Corporate Human Resources
One Court Square, 15/2
Long Island City, NY 11120
Tel: (718) 248-5058/Fax: (718) 248-5000

**EXHIBIT C**

**PERFORMANCE STANDARDS**

### CitiStreet Service Standards for the Citigroup 401k Plan

Interactive Voice Response (IVR) System Availability
- IVR availability is measured daily 24 hours a day. The performance standard is:

  — No more than two (2) outages of 20-60 minute duration per month;

  — No unscheduled outages greater than 60 minutes in any month; and

  — IVR is available ninety-nine percent (99%) of scheduled hours, measured monthly as the total number of hours the IVR is available divided by the total number of hours it was scheduled for availability.

- The penalty for failing to meet the standard is $ 3,750 quarterly

Web Site Availability
- Web site availability is measured daily 24 hours a day. The performance standard is:

  — No more than two (2) outages of 20-60 minutes duration per month;

  — No unscheduled outages greater than 60 minutes in any month; and

  — Web site is available ninety-eight percent (99%) of scheduled hours, measured monthly as the total number of hours the web site is available divided by the total number of hours it was scheduled for availability.

- The penalty for failing to meet the standard is $ 3,750 quarterly.

Call Center Availability
- Call Center availability is measured daily from 8:00AM to 8:00PM Eastern, Monday through Friday, excluding scheduled holidays. Performance is measured as the total number of hours the Call Center is open for service, divided by the total number of hours it was scheduled to be open for service. The performance standard is one hundred percent (100%) and will be measured monthly.

- The penalty for failing to meet the performance standard is $ 3,750 quarterly.

Telephone Responsiveness

- Telephone responsiveness is measured from the time a caller requests to be transferred to a customer service representative to the time the caller reaches a live voice. The performance standard for telephone responsiveness is eighty percent (80%) of calls answered within thirty (30) seconds, measured on a monthly basis.

- The performance penalty for failing to meet the standard is $ 3,750 quarterly.

Telephone Abandonment

- Telephone abandonment is defined as calls to the Call Center that are not answered and are disconnected by the caller more than twenty (20) seconds from the time of transfer. The performance standard for telephone abandonment is five percent (5%).

- The quarterly penalty for failing to meet the standard is $ 3,750.

Interactive Voice Response (IVR) Abandonment

- IVR abandonment is defined as calls to the IVR that are disconnected by IVR system through no fault of the caller. The performance standard for IVR abandonment is one percent (1%).

- The quarterly penalty for failing to meet the standard is $ 3,750.

Contribution Posting

- Contribution posting is defined by the time from receipt of the reconciled file from payroll to the time the contributions are posted to the employee account. The performance standard is two (2) days.

- The penalty for failing to meet the standard is $ 3,750 quarterly.

Transaction Timing

- Participant-initiated transactions are processed in a timely manner ninety-eight percent (98%) of the time, measured on a daily basis, as defined in the table that follows. Performance is measured as the total number of transactions processed within standard divided by the total number of Participant-initiated transactions.

- The penalty for failing to meet the standard is $ 3,750 quarterly.

| Transaction Type | Processing Timing Standard |
|---|---|
| Transaction request, no written documentation required. | Requests received by NYSE close will be processed the same business day. |
| Transaction request, written documentation required. | Requests with completed information received by 11:00AM (Eastern) will be processed. |
| - Loan Repayments/Payoffs | Scheduled with Payroll; day following payroll post |
| - Hardship Requests | 3 business days |
| - Residential Loans | 2 business days |
| - Rollovers In | 2 business days |
| - QDRO Processing | - 45 business days to Qualify the Order<br>- 5 business days to process account |
| - Death Processing | 5 business days |

Inquiry and Research Request Responsiveness

- Participant-initiated inquiry and research requests are completed in a timely manner ninety-five percent (95%) percent of the time, measured monthly, as defined in the table that follows. Performance is measured as the total number of requests completed within standard divided by the total number of requests. Request completion is defined as initiation of appropriate verbal or written response, or initiation of contact with appropriate third party in cases where third party involvement is required.

- The penalty for failing to meet the standard is $ 3,750 quarterly.

| Request Type | Response Timing Standard For Business Days |
|---|---|
| Inquiry, no written documentation provided or required, no follow-up required. | Same business day. |
| Financial research, no written documentation required. | Third business day if received prior to 8:00PM Eastern. |
| Non-financial research, no written documentation required. | Third business day if received prior to 8:00PM Eastern. |
| Inquiry or research, written documentation required. | Fifth business day if received prior to 8:00PM Eastern. |

Quarterly Statements

- Quarterly participant statements are to be distributed to participants within twenty (20) calendar days following the end of the quarter. "Distributed" shall mean either the date postmarked or the date received by Citigroup for internal distribution.

- The penalty for failing to meet the standard is $ 3,750 quarterly.

*In the event that the existing parental relationship between Citigroup and CitiStreet ceases, expires, terminates, the penalties associated with the service standards would be subject to revision.*