**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------------x

MARYA J. LEBER, SARA L. KENNEDY, LESLIE
HIGHSMITH, SHERRI M. HARRIS, *and all*
*others similarly situated*,

                    Plaintiffs,

              -against-

THE CITIGROUP 401(k) PLAN INVESTMENT
COMMITTEE; THE BENEFIT PLANS INVESTMENT
COMMITTEE OF CITIGROUP,INC.; MICHAEL
CARPENTER; PAUL COLLINS; JAMES COSTABILE;
VIRGIL CUMMING; DAVID DODILLET; ROBERT
GROGAN; WILLIAM HEYMAN; ROBIN LEOPOLD;
ALAN MACDONALD; MICHAEL MURRAY;
CHRISTINE SIMPSON; RICHARD TAZIK; TODD
THOMSON; TIMOTHY TUCKER; DAVID TYSON;
RONALD A. WALTER; GUY WHITTAKER; DONALD
YOUNG; JAMES ZELTER; BRUCE ZIMMERMAN;
and DOE DEFENDANTS 1-20;

                    Defendants.

--------------------------------------------------------------------x

                                                    07-cv-09329-SHS

                                          FOURTH AMENDED CLASS
                                            ACTION COMPLAINT

                                          **JURY TRIAL DEMANDED**

# TABLE OF CONTENTS

I. NATURE OF THE ACTION ............................................................................ 1

II. JURISDICTION AND VENUE .................................................................... 4

III. PARTIES ...................................................................................................... 5

    A.    Plaintiffs. ............................................................................................. 5

    B.    Defendants. ......................................................................................... 7

IV. FACTUAL BACKGROUND ....................................................................... 11

    A.    The 401(k) Plan ................................................................................ 11

    B.    Defendants are Fiduciaries and Parties in Interest. ........................... 13

    C.    Defendants' ERISA Violations. ......................................................... 15

    D.    The Transfer Agent Scheme .............................................................. 26

V. ERISA'S FIDUCIARY STANDARDS .......................................................... 28

VI. CLASS ALLEGATIONS .............................................................................. 32

VII. CLAIMS FOR RELIEF ............................................................................... 35

    COUNT I

    Breach of Duty of Prudence and Loyalty by Failing to Remove or Replace the
    Affiliated Funds as 401(k) Plan Investment Vehicles during the Class Period, which
    Caused Losses to the 401(k) Plan (Violation of § 404 of ERISA, 29 U.S.C. § 1104 by
    Committee Defendants and Defendants Walter and Zimmerman)................................... 35

    COUNT II

    Breach of Duty of Prudence and Loyalty by Selecting Three of the Affiliated Funds as
    401(k) Plan Investment Vehicles during the Class Period, which Caused Losses to the
    401(k) Plan (Violation of § 404 of ERISA, 29 U.S.C. § 1104 by Committee
    Defendants) ..................................................................................................................... 37

Fourth Amended Complaint

COUNT III

Breach of Duty of Prudence and Loyalty by Approving the Mapping of 401(k) Monies
Invested in Unaffiliated Funds into Affiliated Funds, which Caused Losses to the
401(k) Plan (Violation of § 404 of ERISA, 29 U.S.C. § 1104 by Committee
Defendants) ................................................................................................................. 38

VIII. PRAYER FOR RELIEF .................................................................................................. 39

This action involves the Citigroup 401(k) Plan (the "401(k) Plan"), which is sponsored by Citigroup, Inc. ("Citigroup").  Plaintiffs allege the following on behalf of themselves and a class of similarly-situated participants in the 401(k) Plan.

## I. NATURE OF THE ACTION

1.      This case is about self-dealing and imprudent investment of retirement plan assets.  The 401(k) Plan Investment Committees ("Investment Committees")[1] and their individual members (hereinafter, the Investment Committees and their members are the "Committee Defendants"), are fiduciaries of the 401(k) Plan.  The Committee Defendants are responsible for monitoring and making decisions with respect to investment options in the 401(k) Plan.  The Committee Defendants are officers and employees of Citigroup.

2.      As fiduciaries for the 401(k) Plan, Committee Defendants were required by the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1001 *et seq.*, to act prudently and solely in the interest of the 401(k) Plan and its participants and beneficiaries when making decisions with respect to removing, replacing, and monitoring investment options in the 401(k) Plan.  They did not do so.  Instead, they put Citigroup's interests ahead of the interests of the 401(k) Plan's participants by repeatedly failing to remove or replace investment products offered and managed by Citigroup subsidiaries and affiliates which had poor performance and high fees.  Through these actions, they generated substantial revenues for Citigroup at great cost to the 401(k) Plan.

---

[1] At the beginning of the period relevant to this complaint, the investment committee for the 401(k) Plan and Citigroup's defined benefit plans was the Benefit Plans Investment Committee of Citigroup, Inc.  (Though the operative Plan document omits the words "Benefit Plans" from the name of this committee, in practice those words were added, and Plaintiffs follow that practice in this complaint).  Effective August 3, 2005, a successor committee was created, the Citigroup 401(k) Plan Investment Committee.

Fourth Amended Complaint

3.      More specifically, Committee Defendants failed to remove, replace, and adequately monitor certain investment options in the 401(k) Plan that were mutual funds offered and managed by Citi Fund Management, Inc. ("Citi Fund Management"), Smith Barney Fund Management LLC ("Smith Barney"), and Salomon Brothers Asset Management, Inc. ("Salomon Brothers") (collectively "the Affiliated Entities").  All these entities were subsidiaries of Citigroup, Inc. at the time their funds were offered in the 401(k) Plan.

4.      By repeatedly omitting to remove or replace the following nine mutual funds offered in the 401(k) Plan and offered and managed by the Affiliated Entities, Committee Defendants placed Citigroup's interests above the 401(k) Plan's interests: the Citi Institutional Liquid Reserves Fund, Smith Barney Government Securities Fund (subsequently renamed Legg Mason Partners Government Securities Fund), Smith Barney Diversified Strategic Income Fund, Smith Barney Large Cap Growth Fund (subsequently renamed Legg Mason Partners Large Cap Growth Fund), Smith Barney Large Cap Value Fund, Smith Barney Small Cap Value Fund (subsequently renamed Legg Mason Partners Small Cap Value Fund), Smith Barney International All Cap Growth Fund, Smith Barney Fundamental Value Fund (subsequently renamed Legg Mason Partners Fundamental Value Fund), and the Salomon Brothers High Yield Bond Fund (subsequently renamed Legg Mason Partners Global High Yield Bond Fund) ("Affiliated Funds").  There were, and are, many better-performing, lower-fee mutual funds and alternative investment options that Committee Defendants could have replaced the Affiliated Funds with.  In fact, *after* Citigroup sold, on or about December 1, 2005, its mutual fund business run through the Affiliated Entities to Legg Mason, it did eventually (on or about September 4, 2007) replace those funds (except for the Citi Institutional Liquid Reserves Fund) with lower cost alternatives.  However, those funds were replaced only after they were no longer

affiliated with Citigroup subsidiaries, and only when Citigroup and its subsidiaries no longer received revenue from 401(k) Plan assets invested in those funds.

5.     The Committee Defendants met several times a year to monitor investment performance and consider whether changes should be made to the lineup of investment vehicles in the 401(k) Plan.  At each of these meetings, the Committee Defendants failed to take action to remove the Affiliated Funds from the 401(k) Plan until they were no longer affiliated with Citigroup subsidiaries.

6.     On or about April 17, 2003, tens of millions of dollars that 401(k) Plan participants had invested in unaffiliated funds were transferred, without participants taking action (a process termed "mapping"), to various Affiliated Funds when certain unaffiliated funds were eliminated from the 401(k) Plan.[2]  The Committee Defendants approved this automatic mapping of participant investments into Affiliated Funds, thereby enriching Citigroup and its affiliates with additional fee income.

7.     The Affiliated Funds were not only poor performers and expensive, their returns were also hurt by an illegal scheme involving provision of transfer agent services (a type of record keeping service for investment companies) that plagued the Affiliated Funds from at least October 1, 1999 through May 31, 2005.  The U.S. Securities and Exchange Commission ("SEC") brought an investigation, and a settlement was reached in May 2005 in which Citigroup was required to pay over $209 million.  The Committee Defendants were on inquiry notice that

---

[2] The eliminated unaffiliated funds, and, in parentheses, the Affiliated Funds they were transferred into, were: the Van Kampen American Capital Enterprise Fund (Smith Barney Large Cap Growth Fund), the Van Kampen American Capital Comstock Fund (Smith Barney Fundamental Value Fund), the Van Kampen American Capital Government Securities Fund (Smith Barney Government Securities Fund), and the American Express Common Stock Fund (Citi Institutional Liquid Reserves Fund).

something was seriously awry by at least January 1, 2004.  On December 1, 2003, certain facts related to the scheme, including the failure to reveal critical information regarding the transfer agent agreements to the funds' boards when they initially approved those arrangements, were partially disclosed in a prospectus supplement in response to an SEC investigation, but the scheme itself continued.  Committee Defendants knew or should have known that further investigation was warranted, in light of the partial disclosure, which could reasonably have been expected to uncover the complete scheme, and that millions of dollars in excess transfer agent fees were still being siphoned from the Affiliated Funds.  Yet they took no or inadequate action and did not remove the Affiliated Funds as investment options in the 401(k) Plan until years later, and only after their affiliation with Citigroup subsidiaries had terminated.

8.      This is a civil enforcement action under ERISA, and in particular under ERISA §§ 404, 406, and 409, 29 U.S.C. §§ 1104, 1106 and 1109, for losses to the 401(k) Plan caused by Committee Defendants' breaches of fiduciary duty.

9.      This class action is brought by the named Plaintiffs on behalf of the 401(k) Plan and its participants (and their beneficiaries) who invested in the Affiliated Funds at any time from October 18, 2001 through September 4, 2007 ("Class Period"), when most of the affiliated funds were removed from the 401(k) Plan, for losses to the plan caused by Committee Defendants' omissions and actions with respect to their failure to remove or replace the Affiliated Funds as investment vehicles in the 401(k) Plan, and related omissions and actions further described herein.

## II. <u>JURISDICTION AND VENUE</u>

10.      ERISA provides for exclusive federal jurisdiction over these claims.  The 401(k) Plan is an "employee benefit plan" within the meaning of § 3(3) of ERISA, 29 U.S.C. § 1002(3), and Plaintiffs are "participants" within the meaning of § 3(7) of ERISA, 29 U.S.C. § 1002(7),

Fourth Amended Complaint

who are authorized pursuant to § 502(a)(2) and (3) of ERISA, 29 U.S.C. § 1132(a)(2) and (3) to bring the present action on behalf of the participants and beneficiaries of the 401(k) Plan to obtain appropriate relief under §§ 502 and 409 of ERISA, 29 U.S.C. §§ 1132 and 1109.

11.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

12.     This Court has personal jurisdiction over the Defendants because the Court has subject matter jurisdiction under ERISA.

13.     Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2) because Citigroup's principal place of business is located in this district.

### III. <u>PARTIES</u>

A.     **Plaintiffs.**

14.     **Plaintiff Marya J. Leber ("Leber").**  Plaintiff Leber is a resident of Sioux Falls, South Dakota.  Plaintiff Leber is a participant in the 401(k) Plan.  During the Class Period, Leber invested through her 401(k) Plan account in, among other investments, the Citi Institutional Liquid Reserves Fund and the Citigroup Stable Value Fund.

15.     Plaintiff Leber did not know any of the following facts until October 2007:  (a) that the 401(k) Plan had fiduciaries; (b) the identity of the 401(k) Plan's fiduciaries; (c) that the 401(k) Plan's fiduciaries were responsible for prudently selecting investment options for the 401(k) Plan, with an eye-single to the best interests of the 401(k) Plan, its participants and beneficiaries; (d) that ERISA generally prohibits transactions between affiliates and subsidiaries of plan sponsors; (e) that Smith Barney and Salomon Brothers, managers of mutual funds entrusted with 401(k) Plan assets, are (or were) affiliates or subsidiaries of Citigroup during the Class Period; (f) what fees, if any, the Affiliated Funds charged the Plan, its participants and beneficiaries, for Plan investments in the Affiliated Funds; (g) that the fees charged by the

Fourth Amended Complaint

Affiliated Funds were higher than comparable funds and excessive compared to other comparable options that could have been selected for the 401(k) Plan; (h) that the performance of the Affiliated Funds was poor relative to appropriate benchmarks and other comparable options that could have been selected for the 401(k) Plan; (i) that an illegal transfer agent scheme had, from at least 1999 through 2005, adversely affected the returns of the Affiliated Funds and deprived them of tens of millions of dollars in cost savings.

16.     **Plaintiff Sara L. Kennedy ("Kennedy").**  Plaintiff Kennedy is a resident of Gray, Tennessee.  Plaintiff Kennedy participated in the 401(k) Plan during the Class Period. During the Class Period, Kennedy invested through her 401(k) Plan account in, among other investments, the Citi Institutional Liquid Reserves Fund and the Smith Barney Appreciation Fund.

17.     Plaintiff Kennedy did not know any of the following facts until July 2008:  (a) that the 401(k) Plan had fiduciaries; (b) the identity of the 401(k) Plan's fiduciaries; (c) that the 401(k) Plan's fiduciaries were responsible for prudently selecting investment options for the 401(k) Plan, with an eye-single to the best interests of the 401(k) Plan, its participants and beneficiaries; (d) that ERISA generally prohibits transactions between affiliates and subsidiaries of plan sponsors; (e) that Smith Barney and Salomon Brothers, managers of mutual funds entrusted with 401(k) Plan assets, are (or were) affiliates or subsidiaries of Citigroup during the Class Period; (f) what fees, if any, the Affiliated Funds charged the Plan, its participants and beneficiaries, for Plan investments in the Affiliated Funds; (g) that the fees charged by the Affiliated Funds were higher than comparable funds and excessive compared to other comparable options that could have been selected for the 401(k) Plan; (h) that the performance of the Affiliated Funds was poor relative to appropriate benchmarks and other comparable options

that could have been selected for the 401(k) Plan; (i) that an illegal transfer agent scheme had, from at least 1999 through 2005, adversely affected the returns of the Affiliated Funds and deprived them of tens of millions of dollars in cost savings.

18.   **Plaintiff Leslie Highsmith ("Highsmith").**  Plaintiff Highsmith is a resident of Jacksonville, Florida.  She participated in the 401(k) Plan during the Class Period.  During the Class Period, she invested through her 401(k) Plan account in, among other investments, the Smith Barney Large Cap Growth Fund.

19.   **Plaintiff Sherri M. Harris ("Harris").**  Plaintiff Harris is a resident of Los Angeles, California.  She participated in the 401(k) Plan during the Class Period.  During the Class Period, she invested through her 401(k) Plan account in, among other investments, the Smith Barney Large Cap Growth Fund.

**B.   Defendants.**

20.   **Non-defendant Citigroup**.  Citigroup is the sponsor of the 401(k) Plan. Citigroup is a Delaware corporation with its principal place of business at 399 Park Avenue, New York, New York.

21.   **Defendant the Benefit Plans Investment Committee of Citigroup, Inc. ("BPIC").** This committee was in existence from the beginning of the relevant period through August 2, 2005.  The committee and its members were responsible for selecting, monitoring, and evaluating the 401(k) Plan's investment options during that time.  The committee also had such responsibility for Citigroup's defined benefit plans.  The members of the committee during the Class Period, individual Defendants herein, included the following, who were all Citigroup employees when they served on the committee (approximate service dates during the Class Period are indicated in parentheses; statements regarding the background of individual committee members are on information and belief):

A. **Michael Carpenter** (December 2002-August 2005)**:**  positions during his committee tenure included Chairman and CEO of Citigroup Alternative Investments ("CAI").  A few months prior to joining the committee he served as CEO of Citigroup affiliate Salomon Smith Barney.  On information and belief, during his tenure at Salomon Smith Barney, there was a scandal involving conflicts of interest.  Specifically, Salomon Smith Barney stock analyst Jack Grubman was accused of inflating telecom stock recommendations of his firm's investment banking clients during the tech bubble.  On information and belief, during his tenure Carpenter was also sent in March 2002 an internal memo from John Hoffmann, then global research chief for Salomon Smith Barney, admitting that Salomon Smith Barney equity ratings were skewed and biased to favor the stocks of equity underwriting clients.

B. **Paul Collins** (October 2001-August 2002):  served as a Vice Chairman and Member of the Management Committee of Citigroup Inc.

C. **Virgil Cumming** (October 2001-June 2003):  served as Chief Operating Officer for affiliates at Citigroup Asset Management and Chief Investment Officer for certain divisions of Salomon Smith Barney

D. **William Heyman** (October 2001-November 2001):  during his tenure on the committee served as chairman of Citigroup Investments, Inc., a Citigroup subsidiary.

E. **Alan MacDonald** (October 2001-August 2005):  served as the Chief Operating Officer of Global Banking at Citigroup, Inc. and as the Head of the Global Corporate Bank from 1998 to 2004 and responsible for the teams of industry

heads, market managers and relationship managers assigned to Citigroup Inc.
customer base of multinational corporations and financial institutions based in
North America, Europe and Japan.

F. **Michael Murray** (October 2001-August 2005):  Served as Director, Global
Compensation, Benefits, and Employee Services, Citigroup Inc.

G. **Todd Thomson** (October 2001-August 2005):  Served as chief executive officer
of Citigroup Inc.'s Global Wealth Management division.

H. **David Tyson** (October 2001-May 2004): In addition to membership on the BPIC,
he served as the Chairman of the Stable Value Committee.  During his tenure at
Citigroup and Travelers he served as Chief Investment Officer of Citigroup's
proprietary insurance companies.

I. **Guy Whittaker** (October 2001-August 2005):  served as Treasurer of Citigroup
during his tenure on the committee.

J. **James Zelter** (April 2003-August 2005):  From 2003 to 2005, served as Chief
Investment Officer of Citigroup Alternative Investments, and prior to that he was
responsible for the firm's Global High Yield franchise.

22.     **Defendant the Citigroup 401(k) Plan Investment Committee ("4PIC").**  This
committee was the successor to the Benefit Plans Investment Committee of Citigroup, Inc.
effective August 3, 2005.  It was responsible for selecting, monitoring, and evaluating the 401(k)
Plan's investment options effective this date.  The committee's initial name was "Citigroup
401(k) Investment Committee", but this was changed to "Citigroup 401(k) Plan Investment
Committee" effective January 1, 2006.  The members of the committee during the Class Period,
individual Defendants herein, included the following, who were all Citigroup employees when

they served on the committee (approximate service dates during the Class Period are indicated in parentheses; statements regarding the background of individual committee members are on information and belief):

A. **James Costabile** (January 2007-June 2007)**:**  positions included Senior Vice President and national sales manager for Alternative Investments at Citigroup's Smith Barney affiliate.

B. **David Dodillet** (September 2005-December 2006)

C. **Robert Grogan** (September 2005-December 2006)

D. **Robin Leopold** (September 2005-September 2007)**:**  positions included Director of Human Resources for Citi Smith Barney, and Director of Human Resources for the Citi Global Wealth Management business, which includes Citi Smith Barney's Private Client business, Investment Research, and the Private Bank.

E. **Christine Simpson** (September 2005-September 2007)**:**  positions included Director at Citigroup affiliate Salomon Brothers, Managing Director and Head of Human Resources for the Global Banking Division at Citigroup.

F. **Richard Tazik** (September 2005-September 2007)**:** positions included Vice President, Compensation & Benefits, Citigroup.

G. **Timothy Tucker** (September 2005-September 2007)**:**  positions included manager in the research department of Citigroup affiliate Salomon Brothers, and Equity Group Research Manager at Citigroup.

H. **Donald Young** (September 2005-September 2007)**:**  positions included Vice President at Citigroup.

10                    Fourth Amended Complaint

23.     **Ronald A. Walter.**  Walter was not a member of the Investment Committees during the relevant period, but he served as Secretary of the BPIC from at least the beginning of the Class Period through on or about October 27, 2003.

24.     **Bruce Zimmerman.**  Zimmerman was not a member of the Investment Committees during the relevant period, but he served as Secretary of the BPIC from on or about March 22, 2004 through on or about June 23, 2005.  Effective on or about September 23, 2005, he assumed the position of Chief Investment Officer of the Citigroup 401(k) Plan, a position he held through on or about July 23, 2007.

## IV. <u>FACTUAL BACKGROUND</u>

**A.     The 401(k) Plan.**

25.     The 401(k) Plan is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A) and a defined contribution plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34).  Pursuant to ERISA, the relief requested in this action is for the benefit of the 401(k) Plan.

26.     The 401(k) Plan covers eligible employees of Citigroup and its subsidiaries and affiliates.

27.     In a defined contribution plan like the 401(k) Plan, the plan's fiduciaries are responsible for making decisions with respect to removing, replacing, or adding investment options made available to participants in the plan.

28.     When making decisions with respect to removing, replacing, or adding investment options for a defined contribution plan, fiduciaries must act solely in the interest of plan participants and with all due care, prudence, and diligence.

29.     After selecting the investment options for a defined contribution plan, the fiduciaries have a continuing duty to monitor those investment options to ensure that the options

are prudent and in the best interests of plan participants.  Fiduciaries also have a duty to remove and/or replace any investment options where doing so would be prudent and in the best interest of participants.

30.     Once the fiduciaries have determined which investment options to make available, the participants direct how to allocate their salary deferrals among the various investment options.

31.     Citigroup is the sponsor of the 401(k) Plan.  ERISA § 3(16)(B), 29 U.S.C. § 1102(16)(B).

32.     Committee Defendants are responsible for  making decisions with respect to 401(k) Plan investment options.

33.     Citibank is the Trustee for the 401(k) Plan.  The 401(k) Plan pays fees, directly or indirectly, to Citibank.

34.     CitiStreet, formerly, until July 1, 2008 when it was sold to ING, a joint venture between Citigroup and State Street Bank & Trust, provided administrative and recordkeeping services to the 401(k) Plan until July 1, 2008.  The 401(k) Plan has paid CitiStreet millions of dollars each year of the Class Period (2001 to the present).  Hewitt Associates LLC is the current 401(k) Plan record-keeper.

35.     The 401(k) Plan has invested, pursuant to the direction of the Committee Defendants, billions of dollars in the Affiliated Funds, which investments have generated millions of dollars of investment advisory and other fees for Citigroup and its subsidiaries. During the Class Period the 401(k) Plan's investment in mutual funds affiliated with Citigroup averaged almost $2.5 billion a year.

36.     Considering that the 401(k) Plan also invested in Guaranteed Investment Contracts ("GICs") offered by Citigroup's Travelers affiliate and in Citigroup common stock, as much as 74% of the 401(k) Plan's assets in some years of the Class Period were invested in stock or investment products affiliated with Citigroup.

37.     The investment vehicles offered in the 401(k) Plan are not the mutual funds themselves, which trade in "shares" offered to the public and priced on national securities exchanges. The investment vehicles offered to participants through the Plan were unitized investment funds that trade in units. They are, in effect, custom funds that are unique to the 401(k) Plan. On information and belief, these units include as the primary component of their value the corresponding mutual fund shares, but their value also reflects cash or a money market fund and the assessment of Plan expenses not paid by ordinary fund shareholders. Hence, the performance and expenses of the unitized versions of these funds differs from that of mutual funds which are publicly traded and available to the public. Publicly available performance and expense information regarding the mutual funds, such as is available through prospectuses filed with the U.S. Securities and Exchange Commission, overstates the performance and understates expenses of the unitized funds in the 401(k) Plan. The performance and expense data cited in this complaint refers to the publicly available versions of the funds, not the unitized versions, because that is the most comprehensive set of data that is available to Plaintiffs at this time.

**B.      Defendants are Fiduciaries and Parties in Interest.**

38.     ERISA requires every plan to provide for one or more named fiduciaries of the Plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1002(21)(A).

39.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under ERISA § 402(a)(1), but also any other persons who in fact perform fiduciary functions. ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i) (stating that a person is a fiduciary "to the extent . . .

he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets . . .").

40.     The Committee Defendants are fiduciaries to the 401(k) Plan and owe fiduciary duties to the 401(k) Plan and its participants under ERISA in the manner and to the extent set forth in the documents governing the 401(k) Plan, through their conduct, and under ERISA.

41.     The Administrative Committee is the administrator of the 401(k) Plan and a Named Fiduciary of the 401(k) Plan pursuant to ERISA §§ (3)(16(A) and 402(a)(2), 29 U.S.C. §§ 1002(16)(A) and 1029(a)(2), and the documents governing the 401(k) Plan.

42.     The Investment Committees were and are responsible for selecting, monitoring, and evaluating the 401(k) Plan's investment options.  In their capacity to select and monitor investments for the 401(k) Plan, the Investment Committees had and have the discretion and authority to suspend, eliminate, replace, add to, or reduce any of the 401(k) Plan's investments, including investments managed or offered by Citigroup subsidiaries and affiliates.

43.     Defendant Walter, in his capacity as Secretary of the BPIC, regularly attended BPIC meetings.  As Secretary, he had the authority to recommend to the BPIC removal, addition, or replacement of 401(k) Plan investment options.  Defendant Walter also had responsibility for monitoring 401(k) Plan investments, and regularly reported to the BPIC on the results of his monitoring.

44.     Defendant Zimmerman, in his capacity as Secretary of the BPIC and later Chief Investment Officer of the 401(k) Plan, regularly attended BPIC and 4PIC meetings.  In those capacities, he had the authority to recommend to members of the Investment Committees removal, addition, or replacement of 401(k) Plan investment options.  Defendant Zimmerman

also had responsibility for monitoring 401(k) Plan investments, and regularly reported to the Investment Committees on the results of his monitoring.

45.     During the relevant period, Committee Defendants and Defendants Walter and Zimmerman were all Citigroup employees and corporate officers.  As corporate officers, they had a duty to act in the best interests of Citigroup.  But ERISA requires that when corporate officers act as plan fiduciaries, they must put their duty to the corporation aside and act instead in the exclusive interest of plan participants.  29 U.S.C. §1104(a)(1)(A).

46.     Citigroup is the sponsor of the 401(k) Plan and, thus, by statutory definition a party in interest.  In addition, the Administrative Committee and the Investment Committees are internal committees created and staffed by Citigroup.

**C.     Defendants' ERISA Violations.**

47.     The Committee Defendants had the sole discretion to make decisions with respect to the investment options available under the 401(k) Plan, including the decision to remove or replace investment options.  Over many years, through their omissions and actions in failing to remove or replace the Affiliated Funds as investment options in the Plan until they were no longer affiliated with Citigroup, Committee Defendants caused billions of dollars of 401(k) Plan assets to be directed into the Affiliated Funds, which had poor performance and high fees compared to comparable funds.

48.     On December 1, 2005, Citigroup sold Citigroup Asset Management ("CAM") to Legg Mason, Inc.  CAM consisted largely of the mutual fund businesses operated and managed by Smith Barney, Salomon Brothers, and Citi Fund Management.  The sale meant that the Affiliated Funds were no longer managed or offered by Citigroup affiliates.  Citigroup retained the brokerage divisions of Smith Barney and Salomon Brothers.

49.     Effective November 20, 2006, as a result of the sale to Legg Mason, Smith Barney and Salomon Brothers funds in which the 401(k) Plan invested were renamed Legg Mason funds.

50.     After selling CAM to Legg Mason, the Committee Defendants conducted an extensive review of the 401(k) Plan's investments and researched new investment options.  The review considered various factors, including investment management fees, the current investment options available under the 401(k) Plan, and performance.  The ostensible goal of the review was to improve performance, reduce 401(k) Plan expenses, and provide greater diversification.

51.     The review culminated in the Committee Defendants' decision to terminate all the Affiliated Funds (except the Citi Institutional Liquid Reserves Fund) as investment options in the Plan, and replace them with collective index funds, target date retirement funds, and select actively managed funds in various asset classes.  This change became effective on or about September 4, 2007.

52.     The review and ultimate decision to terminate the Affiliated Funds occurred only after Citigroup had sold CAM to Legg Mason, in other words, after Citigroup would no longer be generating fees from its own 401(k) Plan with respect to those funds.  The Committee Defendants failed to undertake any such review of the 401(k) Plan's investments when the 401(k) Plan's investments in the Affiliated Funds were generating fees for Citigroup.  This was despite the fact that the Investment Committees met several times every year to monitor and evaluate the prudence of retaining the Plan's investment options.

53.     At virtually every turn, the Committee Defendants placed Citigroup's interests ahead of the 401(k) Plan's interests.  In doing so, they breached their ERISA obligations to

discharge their duties exclusively in the interest of 401(k) Plan participants, and exclusively for the purpose of providing them benefits.  Examples of Defendants' disloyal conduct include

      A.      When the Committee Defendants terminated an investment option, the assets in that investment option were almost always moved into a fund managed by a Citigroup affiliate.  (See the discussion of the April 17, 2003 mapping discussed above in which assets in unaffiliated funds were transferred to affiliated funds).  In making these decisions, Committee Defendants gave no consideration to whether superior non-affiliated investment options might be available.

      B.      On September 5, 2002, Committee Defendants held a meeting and deliberated regarding a major restructuring of the 401(k) Plan investment lineup.  Committee Defendants permitted two representatives of Citigroup Asset Management ("CAM"), the division of Citigroup that included the investment managers of the Affiliated Funds, to attend the meeting and participate directly in the deliberations.  They did so despite the fact that CAM would receive a direct financial benefit if 401(k) Plan assets were invested in the funds they offered.

      C.      During the September 5, 2002 meeting referenced above, Committee Defendants approved in its entirety the plan restructuring proposed by the CAM representatives, which included the addition of three new Affiliated Funds to the 401(k) Plan (the Smith Barney Small Cap Value Fund, the Smith Barney Fundamental Value Fund, and the Citi Institutional Liquid Reserves Fund), and the mapping of investments in unaffiliated funds into affiliated funds.  In making this decision, Committee Defendants considered no alternatives to Affiliated Funds, even though numerous lower cost and better performing funds were available.

D.      From the beginning of the Class Period through September 2005, the BPIC was responsible for monitoring and determining what funds were in the 401(k) Plan investment lineup.  The BPIC was responsible not only for 401(k) Plan investments, but also for investments in Citigroup's defined benefit pension plans.  During this period, the BPIC devoted almost the entirety of its meetings to consideration of defined benefit pension plan investments, and discussing exhaustive analyses of manager performance.  Typically, the only comment regarding the performance of 401(k) Plan investments was the rote statement that "performance was in line with expectations." This difference comports precisely with a breach of loyalty.  If the defined benefit plans performed well, it would directly benefit Citigroup financially, since shortfalls would have to be made up by Citigroup and surpluses accrue to Citigroup in the event of plan termination.  On the other hand, if the defined contribution 401(k) plan investments performed well, it would have no financial benefit to Citigroup, but only to plan participants.

54.     Press reports that CAM was being sold to Legg Mason circulated at least as early as June 2, 2005 in which the New York Times disclosed ongoing talks between Citigroup and Legg Mason.  Shortly thereafter, Committee Defendants got much more serious about monitoring 401(k) Plan investments.  A new committee dedicated solely to the 401(k) Plan, the 4PIC, was created.  An official watchlist for underperforming 401(k) Plan funds was created and several Affiliated Funds were placed on the list.  This conduct is also reflective of a breach of the duty of loyalty.  When the funds in the 401(k) Plan were Citigroup proprietary funds and investment in them benefited Citigroup, Committee Defendants were not interested in how well the funds performed, because regardless of the performance the investment benefited Citigroup. However, once investment no longer benefited Citigroup, Committee Defendants apparently

decided that they might as well make some effort to monitor fund performance and see that better funds were put into the 401(k) Plan.

55.     During the Class Period, the 401(k) Plan routinely invested in Affiliated Funds that charged investment advisory fees that were higher than comparable funds.  For example, the following Affiliated Funds had expense ratios that were much higher than those charged by comparable funds offered by the Vanguard Group, Inc.:

--Salomon Brothers High Yield Bond Fund— 228% higher fees than comparable Vanguard fund;

--Smith Barney Diversified Strategic Income Fund — 223% higher fees than comparable Vanguard fund;

--Smith Barney U.S. Government Securities Fund— 140% higher fees than comparable Vanguard fund;

--Smith Barney Fundamental Value Fund— 105% higher fees than comparable Vanguard fund;

--Citi Institutional Liquid Reserves Fund — 100% higher fees than comparable Vanguard fund;

--Smith Barney International All Cap Growth fund — 100% higher fees than comparable Vanguard fund;

--Smith Barney Large Cap Value Fund — 76% higher fees than comparable Vanguard fund;
--Smith Barney Large Cap Growth Fund— 60% higher fees than comparable Vanguard fund; and

--Smith Barney Small Cap Value Fund — 36% higher fees than comparable Vanguard fund.

56.     The effect of excess fees on retirement savings is quite significant.  Higher fees not only reduce plan assets but hinder the growth of savings through the opportunity costs of having less to re-invest.  Under typical assumptions, the effect of an additional 1% in fees can reduce the effective life of a retirees savings balance by ten years.

57.     Figure 1 below illustrates the plan balance of a typical retiree through the working/savings and retirement/spending phases of the portfolio.

Figure 1



58.     Figure 1 considers the portfolio trajectory for a typical employee. In this example, an individual starts saving at age 25 and continues so until age 65. At that time, savings are withdrawn until the balance reaches $0.  As illustrated, the effective life of the assets moves from age 88 to age 78 if fees are increased by 1%.[3]

59.     During the Class Period, the Affiliated Funds also significantly underperformed relevant benchmarks and comparable funds during the time that they were offered in the 401(k) Plan.[4]  In aggregate, 401(k) Plan participants would have earned over $40 million more if they

---

[3] A note about other assumptions in this analysis: The participant earns $40 thousand per year and saves 5% annually towards retirement. Inflation is assumed to be 2.5%, which increases salary and annual contributions accordingly. Investment returns are assumed to be 9%, and at retirement, the participant withdraws 70% of their projected salary on an inflation adjusted basis.

[4] The Affiliated Funds were offered in the 401(k) Plan through on or about the following time periods (if no beginning time is stated the fund was in the 401(k) Plan at the beginning of the class period (10/18/01):  Smith Barney Government Securities Fund (through 9/4/07), Smith Barney Diversified Strategic Income Fund (through 4/21/03), Smith Barney Large Cap Growth Fund (through 9/4/07), Smith Barney Large Cap Value Fund (through 4/21/03), Smith Barney

had earned, on the money invested in the Affiliated Funds, the returns of the relevant passive

benchmark index for each of the Affiliated Funds, rather than the returns of the Affiliated Funds

themselves.  Moreover, if they had instead earned the *average* return of comparable investment

vehicles available to institutional investors such as the 401(k) Plan (such as separately managed

accounts), participants would have earned over $80 million more.  And if they had instead

invested in top performing mutual funds available during the period, they would have earned

over $200 million more.  Specific examples of underperformance during the Class Period

include:

> — the Smith Barney Small Cap Value Fund, which from 4/21/03-9/4/07 earned $15
> million less for participants than they would have earned if they had instead earned the
> returns of a relevant benchmark index, the Russell 2000 Total Return index (and over $30
> million less than would have been earned in a comparable alternative fund);
>
> — the Smith Barney Large Cap Value Fund (from 10/18/01-4/21/03 over $15 million
> less than relevant benchmark index, the Russell 1000 Value Total Return index);
>
> — the Smith Barney International All Cap Growth Fund (from 10/18/01-4/21/03 over $5
> million less than would have been earned in comparable Vanguard index fund, the
> Vanguard Total International Stock Index (VGSTX), and over $11 million less than
> would have been earned in a comparable alternative fund);
>
> — the Salomon Brothers High Yield Bond Fund (from 10/18/01-9/4/07 over $4 million
> less than relevant benchmark index, the BARCAP High Yield Corporate Bond Index, and
> over $11 million less than would have been earned in a comparable alternative fund);
>
> — the Smith Barney Government Securities Fund (from 10/18/01-9/4/07 over $3.5
> million less than relevant benchmark index, BARCAP Aggregate Bond Total Return
> index, and over $7 million less than would have been earned in a comparable alternative
> fund);

---

Small Cap Value Fund (4/21/03-9/4/07), Smith Barney International All Cap Growth Fund
(through 4/21/03), Smith Barney Fundamental Value Fund (4/21/03-9/4/07), and the Salomon
Brothers High Yield Bond Fund (through 9/4/07).  The  Citi Institutional Liquid Reserves Fund
has been in the 401(k) Plan from 4/21/03 through the present; however, it is included within the
class period only through 9/4/07 — after that time it was not offered or managed by a Citigroup-
affiliated entity.

— Smith Barney Large Cap Growth Fund (from 10/18/01-9/4/07 over $3 million less than comparable Vanguard index fund, the Vanguard Growth Index fund (VIGRX), and over $100 million less than would have been earned in a comparable alternative fund);

— Smith Barney Fundamental Value Fund (from 4/21/03-9/4/07 almost $2 million less than relevant benchmark index, the Russell 1000 Total Return, and over $15 million less than would have been earned in another fund in the same category);

— Smith Barney Diversified Strategic Income Fund (from 10/18/01-4/21/03 almost $1 million less than relevant benchmark index, the BARCAP Aggregate Bond Total Return index, and over $3.5 million less than could have been earned in another fund in the same category); and

— Citi Institutional Liquid Reserves Fund (from 4/21/03-9/4/07 roughly half a million dollars less than a comparable Vanguard money market fund, the Vanguard Prime Money Market Fund (ticker symbol VMMXX)).

60.    As discussed above, Committee Defendants were performing virtually no monitoring of the performance of the Affiliated Funds at the inception of the Class Period and for several years thereafter.  They thus breached their duties by failing to consider alternatives and remove each of the following funds at that time, or in subsequent years, for these reasons and the reasons noted below:

A.    Smith Barney Large Cap Value Fund:  By the end of 2000, this fund was significantly underperforming the benchmark that fund management had selected to compare it to, the Russell 1000 Large Cap Value Index.  The average annual returns of the Class Z shares used in the 401(k) Plan, since that Class's inception (11/7/94), was 16.52% versus 19.50% for the benchmark.  For the preceding five years, it was 14.11% versus 16.91% for the benchmark.

B.    Smith Barney International All Cap Growth Fund:  By the end of 2000, this fund was significantly underperforming the benchmark that fund management had selected to compare it to, the MSCI EAFE Index.  The average annual returns of the

Fourth Amended Complaint

Class Z shares used in the 401(k) Plan, since that Class's inception (11/7/94), was 5.58% versus 8.24% for the benchmark.

C.      Salomon Brothers High Yield Bond Fund: By the end of 2001, this fund was significantly underperforming a custom benchmark that fund management had created for the fund, the "Salomon Smith Barney High-Yield Market Index." Trailing average annual returns over the preceding five years were 2.75% for the fund and 3.48% for the index. Moreover, in the trailing five years prior to the 10/18/01 Class Period inception, the total return from a comparable Vanguard fund, Vanguard High-Yield Corporate Bond Fund (VHEWX), was approximately 71% higher.

D.      Smith Barney Government Securities Fund: The relevant share class of this fund was significantly underperforming the benchmark fund management selected for the fund, the Lehman Brothers Government Bond Index, over the trailing five years through 12/31/01. Average annual returns for the relevant share class of the fund were 6.54% versus 7.4% for the benchmark.

E.      Smith Barney Diversified Strategic Income Fund: The relevant share class of this fund was significantly underperforming the benchmark fund management selected for the fund, the Lehman Brothers Aggregate Bond Index. In the trailing five years ending 12/31/2000, the fund had average annual returns of 5.55% versus 6.46%. In the trailing preceding year, the fund returned 3.09% versus 11.63% sign for the benchmark, and overall performance worsened in 2001: the fund returned 2.27%, and the index 8.44%.

61. Each of the funds noted below was added to the 401(k) Plan at a September 5, 2002 meeting of the BPIC. At that time, Committee Defendants failed to consider any alternative

funds, including the many better performing or better known alternative funds.  Committee Defendants thus breached their duties by failing to select better performing alternative funds at that time for these reasons and the reasons noted below.

      A.     Smith Barney Small Cap Value Fund:  The inception date for this fund was February 26, 1999; the inception date for the Class Y shares employed in the 401(k) Plan was on or about April 2003.  There was thus insufficient performance history to evaluate this fund when the BPIC approved it for the 401(k) Plan on September 5, 2002.  Committee Defendants thus breached their duties in approving this fund for the plan; the only reason they had for selecting this fund is that having it in the plan financially benefited Citigroup.

      B.     Citi Institutional Liquid Reserves Fund:  This fund consistently underperformed a comparable Vanguard fund, the Vanguard institutional money market fund, including in the years 2000 through 2002.  Committee Defendants thus breached their duties in selecting the fund and failing to consider alternatives at the September 5, 2002 meeting.

62.     The Affiliated Entities received tens of millions of dollars in annual fees for investment advisory and related services to the 401(k) Plan.

63.     Committee Defendants knew or should have known that similar, lower cost, and better performing investment funds were available from unaffiliated entities.  Further, with billions to invest in investment funds, the Defendants could have negotiated single client or separate account investment funds with essentially the same investment style at substantially lower rates.  Mutual funds generally carry higher expense ratios than competing investment products such as collective trusts or pooled separate accounts.

       Fourth Amended Complaint

64. Moreover, when a 401(k) plan invests in a single client, collective trust, or pooled separate account fund, the assets of the fund are considered to be plan assets.  Thus, a pension plan can seek relief under ERISA if the investment manager mismanages the fund.  Mutual fund assets, however, are not plan assets.  Therefore a plan cannot sue a mutual fund manager under ERISA for mismanaging the mutual fund.  Thus, plans give up valuable ERISA rights and remedies when they invest in mutual funds.  Further, the investment advisor for a mutual fund, here the Affiliated Entities, are generally protected from suit under ERISA.  The Defendants knew or should have known this, but put the interests of Citigroup's mutual fund business ahead of the 401(k) Plan's interests.

65. During the Class Period, Defendants Zimmerman and Walter had joint and several responsibility with the Committee Defendants for monitoring 401(k) Plan investments.  For at least some of the Class Period, this responsibility was specified in Investment Policy Statements adopted by Committee Defendants.  For the early part of the Class Period, they exercised this responsibility at least as a functional matter, and regularly reported to Committee Defendants regarding 401(k) Plan investment performance.  They also had responsibility for recommending removal or addition of investments to the plan lineup.

66. Defendants Zimmerman and Walter breached their fiduciary duties by failing to adequately monitor Plan investments, failing to recommend immediate removal of the Affiliated Funds due to their high fees and poor performance, and failing to recommend addition of better performing and lower cost funds.  Prior to August 2004, their monitoring reports to the BPIC on 401(k) Plan investments, either delivered personally or through their deputies, were exceedingly minimal, and far less detailed than reports on the investments in Citigroup's defined benefit

plans.  Frequently they appear to have consisted of nothing more than the rote statement that

"performance was in line with expectations."

**D.     The Transfer Agent Scheme**

67.     The Affiliated Funds were not only poor performers and expensive, their returns

were also hurt by an illegal scheme involving provision of transfer agent services that plagued

the Affiliated Funds from at least October 1, 1999 through May 31, 2005.  In 1997, a division of

Citigroup, Citigroup Asset Management ("CAM"; CAM includes the advisors to the Affiliated

Funds), began to investigate options for the Affiliated Funds when its current transfer agent

contract expired in mid-1999.  The current transfer agent, First Data, had a contract that, for

various reasons, was extremely profitable to it, essentially providing it a windfall.  Since the fees

for the transfer agent were paid out of the assets of the funds, which belonged to the

shareholders, the expiration of the contract provided an opportunity to save the shareholders

money by negotiating a less costly contract with the same or another provider.  However, CAM

instead devised a scheme to funnel the savings not to the shareholders but instead to it.  It did this

by creating a subsidiary, Citicorp Trust Bank, which acted as the nominal transfer agent.  It was

paid by the funds at close to the same rate as the previous transfer agent.  However, other than

manning a small call center, it subcontracted, via a side agreement, almost all the work to the

previous transfer agent, First Data.  However, it paid First Data a significant discount from what

First Data had been receiving — a discount First Data agreed to accept because it could afford to

reduce its fees well below the original fees since the original fees gave it windfall profits.  The

discount started at 33.5% and increased to as much as 60% over the term of the contract.  But

instead of passing the savings on to shareholders, CAM kept these savings as profits, for itself.

68.     The Committee Defendants were on inquiry notice that something was awry by at

least January 1, 2004.  On September 30, 2003, a former Citigroup employee turned

whistleblower alerted the SEC staff of the scheme, and the SEC initiated an investigation.  On

December 1, 2003, the scheme was partially disclosed in a prospectus supplement.  The

supplement noted that the side agreement had not been disclosed to the funds' board's when the

original proposal was approved.  Though the scheme was not fully disclosed at this time, for

example it was not disclosed that Citicorp Trust Bank performed almost none of the work in

exchange for the money it received, the Committee Defendants knew or should have known that

further investigation, which could reasonably have been expected to uncover the complete

scheme and that millions of dollars in excess transfer agent fees were still being siphoned from

the Affiliated Funds, was warranted.  Yet they took no or inadequate action and did not remove

the Affiliated Funds as investment options in the 401(k) Plan until years later, and only after

their affiliation with Citigroup subsidiaries had terminated.

69.     The SEC brought an investigation and a settlement was reached in May 2005 in

which Citigroup was required to pay over $200 million.  It was only on May 31, 2005, in

conjunction with the settlement, that the full extent of the illegal scheme was publicly disclosed.

70.     Due to the Affiliated Funds poor performance, high fees, and the illegal transfer

agent scheme, the 401(k) Plan has suffered millions of dollars a year in losses because

Committee Defendants failed to remove or replace the Affiliated Funds as Plan investment

options, thereby causing the 401(k) Plan to invest billions of dollars in the Affiliated Funds,

which resulted in millions of dollars of revenue for Citigroup while delivering poor investment

returns for the 401(k) Plan.  ERISA prohibits a plan from investing in the plan sponsor's

investment products or paying the plan sponsor fees for services provided to the plan unless the

fiduciary or sponsor can prove that the transactions are exempt.  Even if Defendants can prove

the transactions are exempt from ERISA § 406, 29 U.S.C. § 1106, ERISA does not permit such

arrangements when they are not solely in the interest of the plan or when a prudent, unconflicted fiduciary would choose differently.

71.     Citigroup, as 401(k) Plan sponsor was a party in interest.  It also created and staffed the Administrative and Investment Committees.  Citigroup knew or should have known that the Committee Defendants were breaching their duties under ERISA and engaging in prohibited transactions by causing the 401(k) Plan to do business with Citigroup subsidiaries and affiliates.  In fact, Citigroup welcomed and participated in the Committee Defendants' violations of ERISA.

## V. **ERISA'S FIDUCIARY STANDARDS**

72.     ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries of the Plan.   ERISA § 404(a), 29 U.S.C.§ 1104(a), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and —
>
> (A)     for the exclusive purpose of
>
> > (i)      providing benefits to participants and their beneficiaries; and
> >
> > (ii)     defraying reasonable expenses of administering the plan;
>
> (B)     with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims;
>
> (C)     by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and
>
> (D)     in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this title and Title IV.

73.     ERISA also imposes explicit co-fiduciary duties on plan fiduciaries.  ERISA

§ 405, 29 U.S.C. § 1105, states, in relevant part, that:

> In addition to any liability which he may have under any other provision
> of this part, a fiduciary with respect to a plan shall be liable for a breach of
> fiduciary responsibility of another fiduciary with respect to the same plan
> in the following circumstances:
>
> (1)     if he participates knowingly in, or knowingly undertakes to
>          conceal, an act or omission of such other fiduciary, knowing such
>          act or omission is a breach; or
>
> (2)     if, by his failure to comply with section 404(a)(1) in the
>          administration of his specific responsibilities which give rise to his
>          status as a fiduciary, he has enabled such other fiduciary to commit
>          a breach; or
>
> (3)     if he has knowledge of a breach by such other fiduciary, unless he
>          makes reasonable efforts under the circumstances to remedy the
>          breach.

74.     Under ERISA, fiduciaries that exercise discretionary authority or control over the

selection of plan investments and the selection of plan service providers must act prudently and

solely in the interest of participants in the plan when selecting investments and retaining service

providers.  Thus, "the duty to conduct an independent investigation into the merits of a particular

investment" is "the most basic of ERISA's investment fiduciary duties."  *In re Unisys Savings*

*Plan Litig.*, 74 F.3d 420, 435 (3d Cir. 1996).  As the Department of Labor explains,

> [T]o act prudently, a plan fiduciary must consider, among other factors, the
> availability, riskiness, and potential return of alternative investments for his or her
> plan. [Where an investment], if implemented, causes the Plan to forego other
> investment opportunities, such investments would not be prudent if they provided
> a plan with less return, in comparison to risk, than comparable investments
> available to the plan, or if they involved a greater risk to the security of plan
> assets than other investments offering a similar return.

DoL Ad. Op. No. 88-16A.

75.     Pursuant to these duties, fiduciaries must ensure that the services provided to the

plan are necessary and that the fees are reasonable:

> Under section 404(a)(1) of ERISA, the responsible Plan fiduciaries must act prudently and solely in the interest of the Plan participants and beneficiaries both in deciding … which investment options to utilize or make available to Plan participants or beneficiaries. In this regard, the responsible Plan fiduciaries must assure that the compensation paid directly or indirectly by the Plan to [service providers] is reasonable … .

DoL Ad. Op. 97-15A; DoL Ad. Op. 97-16A

76.     A fiduciary's duty of loyalty requires a fiduciary to act solely in the interest of

plan participants and beneficiaries.  As the Department of Labor has repeatedly warned:

> We have construed the requirements that a fiduciary act solely in the interest of, and for the exclusive purpose of providing benefits to, participants and beneficiaries as prohibiting a fiduciary from subordinating the interests of participants and beneficiaries in their retirement income to unrelated objectives. Thus, in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider only factors relating to the interests of plan participants and beneficiaries in their retirement income. A decision to make an investment may not be influenced by [other] factors unless the investment, when judged solely on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan.

DoL Ad. Op. No. 98-04A; DoL Ad. Op. No. 88-16A.

77.     The Department of Labor counsels that fiduciaries are responsible for ensuring

that a plan pays reasonable fees and expenses and that fiduciaries need to carefully evaluate

differences in fees and services between prospective service providers:

> While the law does not specify a permissible level of fees, it does require that fees charged to a plan be "reasonable." After careful evaluation during the initial selection, the plan's fees and expenses should be monitored to determine whether they continue to be reasonable.

> In comparing estimates from prospective service providers, ask which services are covered for the estimated fees and which are not. Some providers offer a number of services for one fee, sometimes referred to as a "bundled" services arrangement. Others charge separately for individual services. Compare all services to be provided with the total cost for each provider. Consider whether the estimate includes services you did not specify or want. Remember, all services have costs.

> Some service providers may receive additional fees from investment vehicles, such as mutual funds, that may be offered under an employer's plan. For example,

Fourth Amended Complaint

mutual funds often charge fees to pay brokers and other salespersons for promoting the fund and providing other services. There also may be sales and other related charges for investments offered by a service provider. Employers should ask prospective providers for a detailed explanation of all fees associated with their investment options.

*Meeting Your Fiduciary Responsibilities* (May 2004) (available at

http://www.dol.gov/ebsa/publications/fiduciaryresponsibility.html).

In a separate publication, the Department of Labor writes:

> Plan fees and expenses are important considerations for all types of retirement plans. As a plan fiduciary, you have an obligation under ERISA to prudently select and monitor plan investments, investment options made available to the plan's participants and beneficiaries, and the persons providing services to your plan. Understanding and evaluating plan fees and expenses associated with plan investments, investment options, and services are an important part of a fiduciary's responsibility. This responsibility is ongoing. After careful evaluation during the initial selection, you will want to monitor plan fees and expenses to determine whether they continue to be reasonable in light of the services provided.

> * * *

> By far the largest component of plan fees and expenses is associated with managing plan investments. Fees for investment management and other related services generally are assessed as a percentage of assets invested. Employers should pay attention to these fees. They are paid in the form of an indirect charge against the participant's account or the plan because they are deducted directly from investment returns. Net total return is the return after these fees have been deducted. For this reason, these fees, which are not specifically identified on statements of investments, may not be immediately apparent to employers.

*Understanding Retirement Plan Fees and Expenses* (May 2004) (available at

http://www.dol.gov/ebsa/publications/undrstndgrtrmnt.html.)

78.    A fiduciary's duties of loyalty and prudence require it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result, or would otherwise harm plan participants or beneficiaries. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).  Thus, a fiduciary may not blindly follow plan documents or directives

that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor allow others, including those whom they direct or who are directed by plan documents to do so.

## VI. CLASS ALLEGATIONS

79.     Representative Plaintiffs bring this action on behalf of a class defined as:

>       All participants in the Citigroup 401(k) Plan who invested in any of the following funds from October 18, 2001 to September 4, 2007: Citi Institutional Liquid Reserves Fund, Smith Barney Government Securities Fund (subsequently renamed Legg Mason Partners Government Securities Fund), Smith Barney Diversified Strategic Income Fund, Smith Barney Large Cap Growth Fund (subsequently renamed Legg Mason Partners Large Cap Growth Fund), Smith Barney Large Cap Value Fund, Smith Barney Small Cap Value Fund (subsequently renamed Legg Mason Partners Small Cap Value Fund), Smith Barney International All Cap Growth Fund, Smith Barney Fundamental Value Fund (subsequently renamed Legg Mason Partners Fundamental Value Fund), and the Salomon Brothers High Yield Bond Fund (subsequently renamed Legg Mason Partners Global High Yield Bond Fund). Excluded from the class are Defendants, Defendants' beneficiaries, and Defendants' immediate families.

80.     Class certification is appropriate under Fed. R. Civ. P. 23(a) and (b)(1), (b)(2), and/or (b)(3).

81.     The class satisfies the numerosity requirement because it is composed of thousands of persons, in numerous locations. The 401(k) Plan has almost 190,000 participants, most of which have invested in at least one of the Affiliated Funds during the Class Period. The number of class members is so large that joinder of all its members is impracticable.

82.     Common questions of law and fact include:

A.      Whether Defendants caused the 401(k) Plan to invest its assets in mutual funds and other investment products offered or managed by Citigroup subsidiaries and affiliates;

B.      Whether Committee Defendants were fiduciaries responsible for monitoring and making decisions with respect to the investments in the 401(k) Plan;

      C.     Whether Committee Defendants breached their fiduciary duties to the 401(k) Plan by causing the 401(k) Plan to invest its assets in mutual funds and other investment products offered or managed by Citigroup subsidiaries and affiliates; and

      D.     Whether the 401(k) Plan and its participants suffered losses as a result of Committee Defendants' fiduciary breaches.

83.     Plaintiffs' claims are typical of the claims of the Class. They have no interests that are antagonistic to the claims of the Class. Plaintiffs understand that this matter cannot be settled without the Court's approval. Plaintiffs are not aware of another suit pending against Defendants arising from the same circumstances.

84.     Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs are committed to the vigorous representation of the Class. Plaintiffs' counsel, McTigue Law LLP, Bailey & Glasser LLP, and David Preminger of Keller Rohrback LLP are experienced in class action and ERISA litigation. Counsel have agreed to advance the costs of the litigation. Counsel are aware that no fee can be awarded without the Court's approval.

85.     A class action is the superior method for the fair and efficient adjudication of this controversy. Joinder of all members of the Class is impracticable. The losses suffered by some of the individual members of the Class may be small, and it would therefore be impracticable for individual members to bear the expense and burden of individual litigation to enforce their rights. Moreover, Committee Defendants, as fiduciaries of the 401(k) Plan, were obligated to treat all Class members similarly as 401(k) Plan participants pursuant to written plan documents and ERISA, which impose uniform standards of conduct on fiduciaries. Individual proceedings, therefore, would pose the risk of inconsistent adjudications. Plaintiffs are unaware of any difficulty in the management of this action as a class action.

86.     This Class may be certified under Rule 23(b).

A.     23(b)(1).  As an ERISA breach of fiduciary duty action, this action is a classic 23(b)(1) class action.  Prosecution of separate actions by individual members would create the risk of (A) inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for the defendants opposing the Class, or (B) adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudication or substantially impair or impede their ability to protect their interests.

B.     23(b)(2).  This action is suitable as a class action under 23(b)(2)  because the Defendants have acted or refused to act on grounds generally applicable to the Class as a whole, thereby making appropriate final injunctive, declaratory or other appropriate equitable relief with respect to the Class.

C.     23(b)(3).  This action is suitable to proceed as a class action under 23(b)(3) because questions of law and fact common to the members of the Class predominate over individual questions, and this class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action.

## VII. <u>CLAIMS FOR RELIEF</u>

### <u>COUNT I</u>

**Breach of Duty of Prudence and Loyalty by Failing to Remove or Replace
the Affiliated Funds as 401(k) Plan Investment Vehicles during the Class Period,
which Caused Losses to the 401(k) Plan
(Violation of § 404 of ERISA, 29 U.S.C. § 1104 by Committee Defendants and Defendants
Walter and Zimmerman)**

87.     All previous averments are incorporated herein.

88.     At all relevant times, Committee Defendants acted as fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C.§ 1002(21)(A), by exercising discretionary authority and control with respect to the management of the 401(k) Plan and authority or control with respect to the management or disposition of the 401(k) Plan's assets.

89.     At all relevant times, Committee Defendants had the duty to continually monitor the suitability of Plan investment options, and to remove or replace any investment option that was found to be imprudent, e.g. because of high fees.  Committee Defendants met several times each year during the Class Period.  These meetings had among their purposes monitoring the fees, and evaluating the suitability, of the Plan's investment options.

90.     Committee Defendants, by their omissions in repeatedly failing to remove or replace the Affiliated Funds (except after those funds were no longer affiliated with Citigroup) during the Class Period breached their duties of prudence and loyalty under ERISA § 404(a), 29 U.S.C. § 1104(a).  The Committee Defendants omitted to remove these funds because they were affiliated with Citigroup and retaining them as Plan investment options generated income to Citigroup affiliates.  The Committee Defendants failed to remove these funds despite the fact that they offered participants high fees.  Committee Defendants knew that many lower cost funds were available as alternatives to the Affiliated Funds.

91.     Committee Defendants and Defendants Walter and Zimmerman also breached their duties of prudence and loyalty under ERISA, 29 U.S.C. §§1104(a) by disloyally and imprudently monitoring 401(k) Plan investment options during the Class Period, in particular the Affiliated Funds.  Specifically, prior to the time at which it became known that Citigroup Asset Management was going to be sold, these Defendants conducted no or purely perfunctory monitoring of the performance and fees of 401(k) Plan investment options.  This is reflected in the minutes of the Investment Committees by the repetition, meeting after meeting, of the cursory and uninformative statement with regard to 401(k) Plan investments that "performance was in line with expectations," without any supporting evidence or analysis.  This was in stark contrast to the monitoring that occurred (i) with respect to Citigroup's defined benefit plans, and (ii) after it became known that Citigroup Asset Management was going to be sold.  These Defendants conducted exhaustive analysis of Citigroup's defined benefit plan investments, extensively researching managers and being very active in replacing managers who underperformed.  This is reflective of a breach in the duty of loyalty since good performance in Citigroup's defined benefit plans financially benefited Citigroup, while good performance in the 401(k) Plan did not.  Similarly, once it became known that Citigroup Asset Management would be sold, these Defendants no longer had an interest in keeping the Affiliated Funds in the 401(k) Plan in order to benefit Citigroup.  Thus, gradually, monitoring procedures were enhanced and changed to better evaluate the performance and fees of 401(k) Plan investments.  These changes included creation of a separate investment committee for the 401(k) Plan, creation of the position of 401(k) Plan Chief Investment Officer, and creation of a watchlist for suspect 401(k) Plan investments.

92.     As a direct and proximate result of these breaches of duty, the 401(k) Plan, and indirectly Plaintiffs and the 401(k) Plan's other participants and beneficiaries, lost millions of dollars to the Affiliated Funds' high fees.

93.     Pursuant to ERISA § 502(a)(2) and 409(a), 29 U.S.C. § 1132(a)(2) and 29 U.S.C. § 1109(a), Committee Defendants are liable to restore all losses suffered by the 401(k) Plan caused by their breaches of fiduciary duty.

## COUNT II

**Breach of Duty of Prudence and Loyalty by Selecting Three of
the Affiliated Funds as 401(k) Plan Investment Vehicles during the Class Period,
which Caused Losses to the 401(k) Plan
(Violation of § 404 of ERISA, 29 U.S.C. § 1104 by Committee Defendants)**

94.     All previous averments are incorporated herein.

95.     Three of the Affiliated Funds were added to the 401(k) Plan on or about April 17, 2003:  the Smith Barney Small Cap Value Fund, the Smith Barney Fundamental Value Fund, and the Citi Institutional Liquid Reserves Fund.  The addition of these funds was approved at a BPIC meeting on or about September 5, 2002.  The addition of these funds was recommended at the meeting by Citigroup Asset Management, which directly benefited financially from adding these funds to the 401(k) Plan.  BPIC members essentially rubber-stamped this recommendation with virtually no analysis of alternative funds, or the performance or suitability of the funds proposed to be added.

96.     The Committee Defendants were required to prudently and loyally select funds for the 401(k) Plan.

97.     By selecting these three funds for the 401(k) Plan, Committee Defendants breached their duties of prudence and loyalty.  These funds offered high fees.  The Committee Defendants nevertheless selected these funds because they were managed and offered by

Citigroup affiliates, and selecting them would bring millions of dollars in additional revenue to Citigroup affiliates.

98.     Committee Defendants breaches in selecting these three funds caused millions of dollars in losses to the 401(k) Plan.

## COUNT III

**Breach of Duty of Prudence and Loyalty by Approving the Mapping of 401(k) Monies Invested in Unaffiliated Funds into Affiliated Funds, which Caused Losses to the 401(k) Plan (Violation of § 404 of ERISA, 29 U.S.C. § 1104 by Committee Defendants)**

99.     All previous averments are incorporated herein.

100.     Committee Defendants approved the mapping, which occurred on or about April 17, 2003, of tens of millions of dollars 401(k) Plan participants had invested in unaffiliated funds into Affiliated Funds (specifically the Smith Barney Large Cap Growth Fund, Smith Barney Fundamental Value Fund, Smith Barney Government Securities Fund, and the Citi Institutional Liquid Reserves Fund), as discussed above.  This mapping was approved during a September 5, 2002 BPIC meeting.  The mapping was recommended at that meeting by Citigroup Asset Management, which directly benefited financially from mapping 401(k) Plan assets into these funds.  BPIC members essentially rubber-stamped this recommendation with virtually no analysis of alternative funds.

101.     In approving this mapping, Committee Defendants breached their duties of prudence and loyalty.  They approved the mapping not because it would benefit participants, but because it benefited Citigroup affiliates by increasing their fee revenue.  The mapping was not prudent because the investment vehicles into which the funds were mapped had high fees.

102.     By approving this mapping, Committee Defendants caused losses to the 401(k) Plan.

## VIII. <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff prays for relief as follows:

a.  Declare that Defendants breached their fiduciary duties of prudence and loyalty under ERISA;

b.  Issue an order compelling the disgorgement of all investment advisory fees paid and incurred, directly or indirectly, to Citigroup subsidiaries and affiliates by the 401(k) Plan, including disgorgement of profits thereon;

c.  Issue an order compelling Defendants to restore all losses to the 401(k) Plan arising from Defendants' violations of ERISA;

d.  Order equitable restitution and other appropriate equitable monetary relief against Defendants;

e.  Award such other equitable or remedial relief as may be appropriate, including the permanent removal of Defendants from any positions of trust with respect to the 401(k) Plan, the appointment of independent fiduciaries to administer the 401(k) Plan, and rescission of the 401(k) Plan's investments in Affiliated Funds;

f.  Certify this action as a class action, designate the Class to receive the amounts restored or disgorged to the 401(k) Plan, and impose a constructive trust for distribution of those amounts to the extent required by law;

g.  Enjoin Defendants collectively from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

h.  Award Plaintiffs their attorneys' fees and costs pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g) and/or the Common Fund doctrine; and

i.  Award such other and further relief as the Court deems equitable and just.

By: /s/ James A. Moore

James A. Moore(*Pro hac vice*)
J. Brian McTigue (*Pro hac vice*)
**MCTIGUE LAW  LLP**
4530 Wisconsin Avenue, NW
Suite 300
Washington, DC  20016
Tel:  (202) 364-6900
Fax: (202) 364-9960
bmctigue@mctiguelaw.com
jmoore@mctiguelaw.com

Gregory Yann Porter (*Pro hac vice*)
**BAILEY & GLASSER LLP**
1054 31st Street, NW, Suite 230
Washington, DC 20007
Tel: (202) 463-2101
Fax:  (202) 434-8252
gporter@baileyglasser.com

*Counsel for Plaintiffs*

David S. Preminger (DP 1057)
**KELLER ROHRBACK, LLP**
1140 Avenue of the Americas, Ninth Floor
New York, NY 10036
Tel: 646-380-6690
Fax: 646-380-6692
dpreminger@kellerrohrback.com

*Liaison Counsel for Plaintiffs*

Fourth Amended Complaint

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on September 18, 2015, a copy of the foregoing **FOURTH AMENDED CLASS ACTION COMPLAINT** was filed electronically with the Court and served by operation of the Court's ECF notification system upon all counsel of record.

Washington, DC
September 18, 2015

\_\_\s\ James A. Moore_____
James A. Moore
